U.S. District Federal Court Civil Action

## 06 - CV - 00291 ᴿᴱᴮ ᴹᴱᴴ

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB 2 1 2006

GREGORY C. LANGHAM
CLERK

Aaron J. Douglas, Plaintiff

3267 Gunnison Drive

Fort Collins, Colorado, 80526

vs.

The Alaron Trading Corporation

822 West Washington Boulevard

Chicago, Illinois, 60607

(phone) 312-563-8000

and

RECEIVED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB 2 1 2005

GREGORY C. LANGHAM
CLERK

Mr. Thomas Heneghan of and Mr. James R. Gauspohl of G and G Brokers

1036 Garfield Avenue

Venice, California, 90921

(phone) 310-578-9477

(fax) 310-578-0989

This suite alleges fraudulent behavior on the part of Mr. Thomas Heneghan who

failed to execute a direct sell-order on put options that the defendant purchased in

executing a dir4ct order from plaintiff on July 5, 2004. The plaintiff was contacted

by Mr. Thomas ("Tom") Heneghan, a licensed affiliate of the Alaron Corporation by telephone in the winter of 2004. Mr. Heneghan seems to be the principal broker of G and G Brokers, a Venice, California firm . Mr. Heneghan may be a limited (e.g., franchise owner-) partner of G and G Brokers or he may be an employee of the owners of G and G Brokers. Mr. Heneghan contacted plaintiff approximately 3-to-5 times before plaintiff signed a contract to use a representative of Alaron Corporation as a broker for the purchase of commodity. Mr. Heneghan contacted plaintiff and indicated that he would like to buy and sell commodity options for plaintiff.

Plaintiff indicated that at that time–and whenever Mr. Heneghan contacted him intermittently for the next several months--he might consider being represented by Mr. Heneghan at some time in the near-to- intermediate future, but that he was recovering financially from some defaults on some loans that he had made to some close personal friends. Mr. Heneghan indicated that he had contacted plaintive in 2003 and that plaintiff had indicated that he might be free to enter the market in 2004. Plaintiff replied that, unfortunately, he did not remember the earlier call. Before the conversation terminated, Mr. Heneghan indicated that if plaintiff had no objections, he would contact plaintiff at intermittent intervals about trades that he was recommending to his clients so that plaintiff could keep track of Mr. Heneghan's record with respect to successful or unsuccessful calls.

2

Plaintiff purchased a house in December of 2004.  At about this time Mr. Heneghan pointed out to plaintiff in a phone conversation that his record for 2004 included 6 money making transactions in the options commodity markets.  Plaintiff indicated to Mr. Heneghan that he would open an account with Mr. Heneghan after he had sold his condominium.  Plaintiff had purchased a house and made a down payment at the December 27, 2004 closing.  He had two mortgages outstanding after the closing.  Upon the sale of the condominium on June , 27 2004 with a net gain to , plaintiff paid a large sum on the mortgages.  He contacted Mr. Heneghan the next week and indicated that he was willing to buy about $2,000-to-$2,500 worth of options from Mr. Heneghan.  Mr. Heneghan indicated that he thought that September, 2005 put bond market options  were likely to provide a  very good return.

Plaintiff proceeded to wire to Mr. Heneghan $3,200 on July 5, 2005 from his checking account at the First National Bank of Fort Collins.  However, before signing with Mr. Heneghan, plaintiff sent to Mr. Heneghan at the Venice, California address of G & G brokers a signed copy of the Alaron Corporation's customer's agreement document.  Furthermore, the money was wired to the following address:

Harris Bank, 111 West Monroe Avenue

Chicago, Illinois 60606

3

ABA # 071000288

 Credit to Alaron Trading Corporation

Customer Segregated Account

Aaron J. Douglas

36990


Mr. Heneghan then proceeded to take a $785.40 transactions fee for the purchase

and made a purchase of $2,031.30for 10 September 05 $112 puts at a price of

13/64 (the "net" dollar price is $203.130; 1000(13/64) = $203.125 so there is a

slight discrepancy between the listed and net price).   Thus, there was $383.30 left

after Mr. Heneghan purchased plaintiff obtained the information from Alaron

Corporation by telephone with regard to the net price and the transaction fee.

Alaron sent plaintiff an electronic receipt of the transaction on August 2, 2005

(item A).  The reason for the delay in the transmission of the receipt is not clear,

although the July 5, 2005 date of the transaction is clearly recorded on the receipt.

There is an Alaron Corporation monthly activity statement dated July 7, 2005

attached by plaintiff that shows a slight decline in the opening position (from

$2031.30 to $1875).  However, Mr. Heneghan told plaintiff that he was using his

judgement to time the purchase of the puts so that he could deliver the maximum

dollar value to plaintiff for the transaction.

Plaintiff then went to southern Arizona and northern Mexico on Friday, July 22 to conduct personal business.   He gave Mr. Heneghan the phone number of the Marriott Hotel in Nogales, Arizona where he could be reached over the weekend of July 22-to-24 in case Mr. Heneghan wanted authorization for selling the puts at a profit.   In fact, Mr. Heneghan called the plaintiff and left a voice mail message on the phone that plaintiff received on the evening of August 22 at about 10 pm. However, it was received too late to initiate business and there were no voice mail messages from Mr. Heneghan waiting for the plaintiff upon his return to work on Tuesday, July 26, 2005.

Plaintiff called Mr. Heneghan on the afternoon of Thursday, July 28 to inquire about his account.  Mr. Heneghan could not be reached by the land line and plaintiff believes that no one if the office responded to the call.  That evening plaintiff opened one of the electronic account balance statements from Alaron Corporation and made the incorrect inference that because the date of the transmission was recent, the current value of the options was recorded in the receipt and not the value at the time of purchase.

However, while plaintiff admits that he was negligent in getting information about the value of the options and the recent price action, this was partly a response to Mr. Heneghan's deliberate and fraudulent intent to ignore plaintiff's instructions.

Mr. Heneghan should have informed plaintiff of the lack of current value and price information in the Alaron receipts and indicated appropriate sources for the pertinent information.  Mr. Heneghan did not perform even the most minimal and perfunctory obligatory service of providing plaintiff with the names of third party information sources because he never intended to perform his primary contractual obligation to execute the transactions ordered by plaintiff in a timely and efficient manner.

Hence, during the conversation of Friday, July 29 Mr. Heneghan indicated to plaintiff that the options were in fact worth about $1900.  Plaintiff had made 3-to-4 options transactions roughly 10 years ago and had little experience with options that had lost value since purchase but still had some residual time dependent market.   The transaction receipt sent by E-mail to plaintiff by the Alaron Corporation and the plaintiff has attached this receipt and 6 others including the post-September account statement to the brief.  However, these receipts report none of the short term market fluctuations in value.

Plaintiff also attaches 2 sets of price reports in Microsoft Excel format from the Chicago Board of Trade.  These documents  list changes in the intra- and inter-day value of the U.S. on September 05 $112 put options.  Plaintiff requested this data from the CBOT on or about September 1, 2005.  Plaintiff also attaches copies of

one of the requests and one of the replies from Mr. Jireh Ray, an employee of the CBOT. The documents cover the period from July 22 to August 2 and from August 3 to August 10.

The documents indicate that the puts that Mr. Heneghan purchased for the plaintiff on July 5, 2005 had declined in value to roughly 50% of their initial purchase price of 13/64 in mid-July. The put options began to rally on Thursday, July 28; July 28 is the day that plaintiff first tried to contact Mr. Heneghan upon his return from Mexico. Plaintiff contacted Mr. Heneghan on Friday, July 29 by phone. Mr. Heneghan indicated that Mr. Douglas' bond put options were down substantially but he asserted that he expected the options to rally during the week of August 1-August 5 and to post a handsome profit. Mr. Douglas indicated in plain simple laymen's language that: (1) he was pleasantly surprised that the puts had any remaining positive value; (2) that he wanted Mr. Heneghan to sell the options before market close on that day (Friday, July 29) and was willing to accept a loss relative to his initial investment in order to protect himself against further loss, (3) that he thought that Mr. Heneghan's surmise that the put options would rally next week was reasonable but that plaintiff thought that 3-4 days after the presentation by the Chairman of the Federal Reserve bank on Tuesday August 2, the puts would completely collapse in value; and (4) plaintiff recognized that it might be difficult to execute the sell-order by market close on Friday without some kind of transaction

7

loss in which case he would find execution of the sale by close of business on
Monday acceptable; and (5) failure to execute the sale order by close of business
Monday would constitute a grossly negligent and fraudulent failure on Mr.
Heneghan's part to fulfill the sale ordered by Mr. Douglas.

Plaintiff made it perfectly clear that he could tolerate a delay in sale until Monday,
but that he was not asking Mr. Heneghan to seek a favorable market trend but to
get substantial value for the assets while selling as quickly as possible.

Plaintiff used the time honored phrase "buy on the rumor, sell on the fact" to
underline his firm conviction that a failure to sell the options (by Mr. Heneghan)
before market close on Monday August 1 would entail a serious loss in value.
In using this phrase plaintiff made explicit reference to a statement by Alan
Greenspan, chairman of the U.S. Federal Reserve Bank with respect to the Federal
Reserve Bank's position on raising interest rates. This statement was to be
delivered early in the week of August 1-5, 2005, and plaintiff thought that a
speech indicating that the Federal Reserve Bank would continue to raise interest
rates would "validate" the rumor that the Federal Reserve would continue to raise
rates (thereby causing a decline in bond prices, hence causing losses to investors
with long positions in bonds and bond options and gains to investors with short
positions in bonds and bond options). As expected, the Greenspan statement of

8

the week of August 1-5 indicated that the Federal Reserve would continue to raise rates.

The price action described by the price data forwarded by CBOT bears out plaintiff's conviction that the puts would rise a bit before fall sharply after the Greenspan presentation. The closing price was 12/64 on Friday; this would have involved some loss in value, but the net proceeds to plaintiff would have been about $1,825 even after deducting an additional ($5 per option or) $50 total transaction fee. The high price on Monday, August 1 was 19/64; if plaintiff had received the proceeds from the sale at this price he would have received about $2919 even after deducting a $50 transaction fee. In either case, Mr. Heneghan's failure to execute the orders of the plaintiff were very costly.

Note that there is an asymmetry in the brokers transaction fees. Roughly 85%-to-98% of the typical brokers transaction charges are made by opening a position and 15%-to-5% is made by closing a position. Plaintiff called two brokers during the business week of September 20-to-24 including a phone call to a broker ("Adam") of A. Packard Trading of Vero Beach Florida. This firm was chosen randomly as being near the top of the list when plaintiff did a Google$^{TM}$ search for commodity brokers. Unfortunately. they only list a toll free number (1-800-843-6187) and an e-mail address (apackard@apackardtrading.com). Adam indicated that the fee of

9

$78.54 per option charged by Mr. Heneghan was not exorbitant, but that it was high. He indicated that he and his fellow brokers at Packard charged about $25 per option for similar transactions.   Packard's fees for executing a sell order were only $5 per option.

Similar information was given to plaintiff by Mr. Arrow, the owner of Arrow Futures and Trading of 141 W. Jackson Boulevard. Chicago, Illinois, 60604 during a phone call to their toll free number (1-800-214-1500; they also list 312-786-1695 as a phone number).   Mr. Arrow said that he might charge as much as $41 for opening position at the CBOT but only about $35 per option for a transaction involving the purchase of 10 or more options.   Mr. Arrow also indicated that he charged only $1 per option for executing a sell order.   Both brokers indicated that they never argued with a client with given a sell order.   Adam indicated that he probably could have executed the sell order on Friday, July 29 and would have done so if the client had used the strong language of plaintiff.   He said that he might have suggested selling 3 puts on Friday and holding onto 7 until Monday to gauge the strength of the increase in value and conferring with the client on Monday.   After an early or mid-day discussion with the client he would have sold the regaining options before close of business on Monday.

Plaintiff attaches a photocopy of the Alaron contractual agreement signed by

10

plaintiff stipulating the obligation of the broker to execute transactions in a prompt and timely manner (item B).

Plaintiff asks for a remedy of an cash award of $130,000 from the defendants. The requested award is composed of a direct loss of approximately $3,000. The remaining $127,000 is the inflation adjusted sum stipulated as the penalty in cases of violations of the Commodity Exchange Act. Title 17 of the U.S. Code stipulates fines that should be set by the Commodity Exchange Commission in cases of broker fraud. See Commodity and Securities Exchanges, 17 U.S.C., part 143, section 143.8 (Inflation-adjusted civil monetary penalties) for authority to federal courts to collect penalties for convictions assessed against violations of the Commodity Exchange Act. Thus, 143.8(a) states "...the inflation adjusted maximum civil monetary penalty for each violation of the Commodity Exchange Act or the rules or orders promulgated thereunder... pursuant to...a civil action in Federal court will be": (1) "For each violation for which a civil monetary penalty is assessed against any person (other than a contract market) pursuant to section 6c of the Commodity Exchange Act, 7 U.S.C. 9:"

(ii) "For violations committed on or after October 23, 2000 not more than the greater of $120,000 or triple the monetary gain to such person for each violation";

(2) "For each violation for which a civil monetary penalty is assessed against any person other than a contract market pursuant to section 6c of the Commodity

Exchange Act, 7 U.S.C. 13a-1 :"

(ii) "For violations committed on or after October 23, 2000 not more than the greater of $120,000 or triple the monetary gain to such person for each violation; and"

(b) "The Commission will adjust for inflation the maximum penalties set forth in this section at least once every four years". Plaintiff assumes that the inflation adjustment for the 4-year 2000-2004 interval will be at least $10,000. Hence, plaintiff is asking the court to assess the minimum penalty and instead return to plaintiff a sum equivalent to the maximum fine as punitive damages for the wrong inherent in the willfully fraudulent actions of the agent of the Alaron Corporation, Mr. T. Heneghan.


Turning to Commodity Exchange Act, 7 U.S.C. 13(a)-(1):

(a) "Felonies generally: It shall be a felony punishable by a fine of not more than $1,000,000 (or $500,000 in the case of a person who is an individual) or imprisonment for not more than five years, or both, together with the costs of prosecution, for:

(1) Any person registered or required to be registered under this chapter, or any employee or agent thereof, to embezzle, steal, purloin, or with criminal intent convert to such person's use or to the use of another, any money, securities, or property having a value in excess of $100, which was received by such person or

any employee or agent thereof to margin, guarantee, or secure the trades of contracts of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person. The word "value" as used in this paragraph means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

When Mr. Heneghan failed to execute the sell order from plaintiff in a timely manner—that is, he refused to execute any sell order at all during the life of the contract—he embezzled the funds of the plaintiff. Mr. Heneghan was acting as an agent of Alaron, a brokerage establishment registered with the CBOT. Thus, plaintiff has grounds to ask for criminal conviction against Alaron Corporation and Mr. Heneghan and a criminal conviction would entail a much higher penalty (of at least $500,000).

Further, under the Commodity Exchange Act, 7 U.S.C. 6b it is:
"unlawful (1) for any member of a registered entity, or for any correspondent, agent, or employee of any member, in or in connection with any order..."
(I) "to cheat or defraud or attempt to cheat or defraud such other person;"
(iii)"willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order".

The Alaron contract states any agent acting as an agent of Alaron will execute

orders for which funds are available, and Mr. Heneghan's willful fraudulent failure

to execute a sell order on a contract that had been fully paid for by plaintiff is a

violation of 7USC6b.   Mr. James Richard Gauspohl is identified as the registered

Alaron Broker on the Alaron statements; a phone conversation with Alaron

employees indicated that Mr. Gauspohl is an employee or an owner of G and G

Brokers.   However, plaintiff has never spoken with Mr. Gauspohl.

Plaintiff chooses to pursue remedy for this violation of the Commodity Exchange

Act as a civil action.  Thus, plaintiff asks the court to eschew the maximum penalty

for civil violations in favor of assessing an equivalent sum as punitive damages and

returning this sum of $130,000 to plaintiff for the wrong (tort) inflicted by Mr.

Heneghan on plaintiff.  Plaintiff suffered intense mental anguish during the

conversation with Mr. Heneghan in which Mr. Heneghan asserted that he would not

execute sell orders from plaintiff as indicated in the Alaron contract.  During this

conversation Mr. Heneghan raised his voice, used mild profanity ("hell"), and

adopted a hostile threatening tone designed to intimidate and create a sense of

helplessness on the part of plaintiff.   Plaintiff also attaches a photocopy of the

business card that Mr. Heneghan forwarded to plaintiff.

Plaintiff received a check for approximately $370 from the Alaron corporation in

14

late September or early July in closing the account.

# CUSTOMER ACCOUNT AGREEMENT

ACCOUNT NAME

ACCOUNT NUMBER

ACCOUNT EXECUTIVE

BUSINESS INTRODUCED BY

For further information you may contact your Alaron Trading Broker or go to www.alaron.com

Alaron

**MAKE ALL CHECKS PAYABLE TO:** Alaron Trading Corporation

**IF WIRING FUNDS, USE THE FOLLOWING INSTRUCTIONS:**

**BANK:**
Harris Bank 111 W. Monroe
Chicago, IL 60606

**ABA NUMBER:**
071-000-288

**CREDIT TO:**
Alaron Trading Corp.
Customer Segregated Account
#165-083-7

FOR FURTHER CREDIT TO THE ACCOUNT OF:_____

**PLEASE NOTE:** The originator of all funds to be deposited into your Alaron account by check, wire or otherwise, must always match the name listed as the account owner.

**FOR INTERNATIONAL WIRES:** Include International Swift Address: **HATRUS44**

**IF YOU ARE TRANSFERRING YOUR TRADING ACCOUNT TO ALARON:**
1) Complete and sign account transfer form - **Page 22**
2) Attach a copy of your last statement

**Alaron Trading Corporation**
## RISK DISCLOSURE STATEMENT

This statement is furnished to you because Rule 1.55 of the Commodity Futures Trading Commission requires it. The risk of loss in trading commodity futures contracts can be substantial. You should, therefore, carefully consider whether such trading is suitable for you in light of your circumstances and financial resources. You should be aware of the following points:

1. You may sustain a total loss of the funds that you deposit with your broker to establish or maintain a position in the commodity futures market, and you may incur losses beyond these amounts. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the time required by your broker, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

2. Under certain market conditions, you may find it difficult or impossible to liquidate a position. This can occur, for example, when the market reaches a daily price fluctuation limit ("limit move").

3. Placing contingent orders, such as "stop-loss" or "stop-limit "orders, will not necessarily limit your losses to the intended amounts, since market conditions on the exchange where the order is placed may make it impossible to execute such orders.

4. All futures positions involve risk, and a "spread" position may not be less risky than an outright "long" or "short" position.

5. The high degree of leverage (gearing) that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. Leverage (gearing) can lead to large losses as well as gains.

6. You should consult your broker concerning the nature of the protections available to safeguard funds or property deposited for your account.

ALL OF THE POINTS NOTED ABOVE APPLY TO ALL FUTURES TRADING WHETHER FOREIGN OR DOMESTIC. IN ADDITION, IF YOU ARE CONTEMPLATING TRADING FOREIGN FUTURES OR OPTIONS CONTRACTS, YOU SHOULD BE AWARE OF THE FOLLOWING ADDITIONAL RISKS:

7. Foreign futures transactions involve executing and clearing trades on a foreign exchange. This is the case even if the foreign exchange is formally "linked" to a domestic exchange, whereby a trade executed on one exchange liquidates or establishes a position on the other exchange. No domestic organization regulates the activities of a foreign exchange, including the execution, delivery, and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country. Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs. For these reasons, customers who trade on foreign exchanges may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures. In particular, funds received from customers to margin foreign futures transactions may not be provided the same protection as funds received to margin futures transactions on domestic exchanges. Before you trade, you should familiarize yourself with the foreign rules which will apply to your particular transaction.

8. Finally, you should be aware that the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting there from, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

This brief statement cannot, of course, disclose all the risks and other aspects of the commodity markets.

I hereby acknowledge that I have received and understood this risk disclosure statement.

X_____

     Customer Signature                                            Date

ACCOUNT NUMBER _____

## RISK DISCLOSURE STATEMENT
Foreign Futures and Foreign Options

This statement is furnished to you because Rule 30.6 of the Commodity Futures Trading Commission requires it.

**The risk of loss in trading foreign futures and foreign options can be substantial. Therefore, you should carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade foreign futures or foreign options, you should be aware of the following:**

1. Participation in foreign futures and foreign options transactions involves the execution and clearing of trades on or subject to the rules of a foreign board of trade.

2. Neither the Commodity Futures Trading Commission, the National Futures Association nor any domestic exchange regulates activities of any foreign boards of trade, including the execution, delivery and clearing of transactions, or has the power to compel enforcement of the rules of a foreign board of trade or any applicable foreign laws. Generally, the foreign transaction will be governed by applicable foreign law. This is true even if the exchange is formally linked to a domestic market so that a position taken on the market may be liquidated by a transaction on another market. Moreover, such laws or regulations will vary depending on the foreign country in which the foreign futures or foreign options transaction occurs.

3. For these reasons, customers who trade foreign futures or foreign options contracts may not be afforded certain of the protective measures provided by the Commodity Exchange Act, the Commission's regulations and the rules of the National Futures Association and any domestic exchange, including the right to use reparations proceedings before the Commission and arbitration proceedings provided by the National Futures Association or any domestic futures exchange. In particular, funds received from customers for foreign futures or foreign options transactions may not be provided the same protections as funds received in respect of transactions on United States futures exchanges. Therefore, you should obtain as much information as possible from your account executive concerning the foreign rules which will apply to your particular transaction.

4. You should also be aware that the price of any foreign futures or foreign options contract and, therefore, the potential profit and loss thereon, may be affected by any variance in the foreign exchange rate between the time your order is placed and the time it is liquidated, offset or exercised.

I have received a separate copy of the above risk disclosure statement, have read and fully understand it.


### FOR CORPORATIONS/PARTNERSHIPS

### FOR INDIVIDUAL/JOINT ACCOUNTS
(All account participants must sign.)


_____
Print Name of Corporation or Partnership

_____   _____
Signature                        Date


_____
Authorized Signature             Date

_____   _____
Signature                        Date


_____
Print Name and Title

_____   _____
Signature                        Date

# TABLE OF CONTENTS

Risk Disclosure Statements.................................................................... 2
Foreign Futures and Foreign Options Risk Disclosure Statement............................ 3
Customer Information.......................................................................... 5
Corporate Account Information................................................................. 6
Partnership Account Information............................................................... 7
Trust Account Information..................................................................... 7
Trust Authorization........................................................................... 8-12
Agreement..................................................................................... 13
W-9 Section................................................................................... 13
Foreign Trader................................................................................ 14
Personal Guarantee............................................................................ 15
Corporate Resolution and Indemnification...................................................... 16
Third Party Controller Statement.............................................................. 17
Managed Account Authorization................................................................. 18
Hedge Confirmation Letter..................................................................... 19
Account Maintenance Fee Policy................................................................ 20-21
Options Disclosure Statement.................................................................. 22
Account Transfer Form......................................................................... 23
Additional Risk Disclosure.................................................................... 24
ALARONLINE Agreement.......................................................................... 23
Customer Agreement............................................................................ 23

## HOW TO OPEN AN ACCOUNT WITH ALARON TRADING CORPORATION

Thank you for applying to open an account with Alaron Trading Corporation. Your account is very important to us. Depending on the type of account you plan to open, the Federal Government regulatory agencies and the exchanges require that we obtain certain information from you. In order to process your account application as promptly and accurately as possible please read and complete the enclosed documents.

### TO OPEN AN ACCOUNT, ALL CUSTOMERS MUST:

1) COMPLETE ACCOUNT APPLICATION
**PAGE 5** (FOR INDIVIDUAL/JOINT ACCOUNTS)
**PAGE 6**(CORPORATE ACCOUNT)
**PAGE 6** (PARTNERSHIP ACCOUNT)
**PAGE 7** (TRUST ACCOUNT)

2) READ CUSTOMER AGREEMENT AND SIGN - **PAGES 8-12**

3) COMPLETE TAXPAYER IDENTIFICATION INFORMATION - **PAGE 13** - U.S. CUSTOMERS sign  W-9
   - ATTACH COPY OF GOVERNMENT IDENTIFICATION

4) READ AND SIGN RISK DISCLOSURE STATEMENT - **PAGES  2-3**

5) READ AND SIGN ACCOUNT MAINTENANCE FEE POLICY - **PAGE  19**

### ADDITIONAL INFORMATION NEEDED FOR:

TRADING NON-US MARKETS
FOREIGN FUTURES AND OPTIONS RISK DISCLOSURE - **PAGE 3**

CORPORATE ACCOUNTS
PERSONAL GUARANTEE - **PAGE 14**
COMPLETE AND SIGN CORPORATE RESOLUTION - **PAGE 15**
INCLUDE ARTICLES OF INCORPORATION

TRUST ACCOUNTS
TRUST AUTHORIZATION - **PAGE 7**
PERSONAL GUARANTEE - **PAGE 14**
INCLUDE TRUST DOCUMENT

PARTNERSHIP ACCOUNTS
GENERAL PARTNERS MUST COMPLETE A CUSTOMER INFORMATION APPLICATION - **PAGE 5**
INCLUDE PARTNERSHIP AGREEMENT LIMITED PARTNERSHIPS MUST INCLUDE  A CERTIFICATE OF LIMITED PARTNERSHIP

MANAGED ACCOUNTS
THIRD PARTY CONTROLLER STATEMENT - **PAGE 16**
MANAGED ACCOUNT AUTHORIZATION - **PAGE 17**

HEDGE ACCOUNTS
HEDGE CONFIRMATION LETTER - **PAGE 18**

## CUSTOMER 1

E-mail Address _____ Drivers License State ____ No. _____
1. Name _____ Social Security No. _____
2. Residence Address _____
3. City _____ State ____ Zip _____ Country_____
Do Not Provide P.O. Box. Refer to line #4 & 5.
4. Mailing address if different from above _____ _____
5. City _____ State ____ Zip _____ Country_____
6. Employer _____ Nature of Business & Occupation _____
7. Business Address _____
8. City _____ State ____ Zip _____ Country_____
9. Home Phone _____ Business Phone _____ Date of Birth _____
10. Bank Reference _____ Account Number _____
11. Bank Address _____ City _____ State ____ Country_____
12. Annual Income $____Less than $25,000 ____$25,000-$50,000 ____$50,000-$100,000 ____Over $100,000
13. Net Worth $____Less than $50,000 ____$50,000-$100,000 ____$100,000-$250,000 ____$250,000-$499,999
$____$500,000-$999,999 ____$1,000,000+
14. Years of Experience: ____ Futures ____ Futures Options ____ Stocks ____ Stock Options ____ Bonds ____ Other
15. Name of Firms traded with: _____
16. Is this a joint account? ____YES ____NO
IF YES, account will be Joint Tenants with Rights of Survivorship unless you indicate here for Tenants in Common
____ Tenants in Common
17. Does any other person/entity:   A. Control the trading of this account? ____YES ____NO (If YES complete pages 14 & 15)
B. Have a financial interest in this account? ____YES ____NO
18. If you have answered YES to any of the above, please give name(s) and phone of person(s):
19. Is there currently pending or has there ever been any litigation, disputed accounts or other unresolved matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you (or your officers or directors if a corporate customer)?

____YES ____NO If YES, please describe _____

## CUSTOMER 2

E-mail Address _____ Drivers License State ____ No._____
1. Name _____ Social Security No. _____
2. Residence Address _____
3. City _____ State ____ Zip _____ Country_____
Do Not Provide P.O. Box. Refer to line #4 & 5.
4. Mailing address if different from above _____ _____
5. City _____ State ____ Zip _____ Country_____
6. Employer _____ Nature of Business & Occupation _____
7. Business Address _____
8. City _____ State ____ Zip _____ Country_____
9. Home Phone _____ Business Phone _____ Date of Birth _____
10. Bank Reference _____ Account Number _____
11. Bank Address _____ City _____ State ____ Country_____
12. Annual Income $_____ Less than $25,000 ____$25,000-$50,000 ____$50,000-$100,000 ____Over $100,000
13. Net Worth $_____ Less than $50,000 ____$50,000-$100,000 ____$100,000-$250,000 ____$250,000-$499,999
____$500,000-$999,999 ____$1,000,000+
14. Years of Experience: ____ Futures ____ Futures Options ____ Stocks ____ Stock Options ____ Bonds ____ Other
15. Name of Firms traded with: _____
16. Is this a joint account? ____YES ____NO
IF YES, account will be Joint Tenants with Rights of Survivorship unless you indicate here for Tenants in Common
____ Tenants in Common
17. Does any other person/entity:   A. Control the trading of this account? ____YES ____NO (If YES complete pages 14 & 15)
B. Have a financial interest in this account? ____YES ____NO
18. If you have answered YES to any of the above, please give name(s) and phone of person(s):
19. Is there currently pending or has there ever been any litigation, disputed accounts or other unresolved matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you (or your officers or directors if a corporate customer)?

____YES ____NO If YES, please describe _____

## CORPORATE ACCOUNT

Corporation papers must be enclosed.                                     E-mail Address _____

1. Name of Corporation_____   Federal Tax ID# _____

2. Address of Corporation _____

3. City _____ State_____ Zip _____ Country_____

Do Not Provide P.O. Box. Refer to line #4 & 5.

4. Mailing address if different from above _____

5. City _____ State_____ Zip _____ Country_____

6. Authorized to act with regard to this account _____

7. Purpose for which Corporation organized _____

8. Corporate Phone _____ Other Phone _____

9. Bank Reference _____ Account Number _____

10. Bank Address _____City _____ State____ Country_____

11. Annual Income After Tax $_____ Less than $25,000 ___$25,000-$50,000 ___$50,000-$100,000 ___Over $100,000

12. Net Worth  $_____ Less than $50,000 ___$50,000-$100,000 ___$100,000-$250,000 ___$250,000-$499,999
        $___$500,000 - $999,999 ___$1,000,000+

13. Years of Experience: ____ Futures ____ Futures Options ____ Stocks ____ Stock Options ____ Bonds ____ Other

14. Name of Firms traded with: _____

15. Will this account be traded on your behalf by anyone other than you? ____YES ____NO (If YES complete pages 14 & 15)

16. Does any other person/entity:    A. Control the trading of this account? ____YES ____NO
                                     B. Have a financial interest in this account? ____YES ____NO

17. If you have answered YES to any of the above, please give name(s) and phone of person(s):

18. Is there currently pending or has there ever been any litigation, disputed accounts or other unresolved matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you (or your officers or directors if a corporate customer)?

____YES ____NO If YES, please describe _____

## PARTNERSHIP ACCOUNT

Partnership Agreement must be enclosed.                                  E-mail Address _____

1. Name of Partnership_____   Federal Tax ID# _____

2. Type of Partnership Account: ____General Partnership ____Limited Partnership ____Other: _____

3. Address of Partnership _____

4. City _____ State_____ Zip _____ Country_____

Do Not Provide P.O. Box. Refer to line #4 & 5.

5. Mailing address if different from above _____

6. City _____ State_____ Zip _____ Country_____

7. Authorized to act with regard to this account _____

8. Purpose for which Partnership organized _____

9. Main Phone _____ Second Phone _____

10. Bank Reference _____ Account Number _____

11. Bank Address _____City _____ State____ Country_____

12. Annual Income After Tax $_____ Less than $25,000 ___$25,000-$50,000 ___$50,000-$100,000 ___Over $100,000

13. Net Worth  $_____ Less than $50,000 ___$50,000-$100,000 ___$100,000-$250,000 ___$250,000-$499,999
        $___$500,000-$999,999 ___$1,000,000+

14. Years of Experience: ____ Futures ____ Futures Options ____ Stocks ____ Stock Options ____ Bonds ____ Other

15. Name of Firms traded with: _____

16. Will this account be traded on your behalf by anyone other than you? ____YES ____NO (If YES complete pages 14 & 15)

17. Does any other person/entity:    A. Control the trading of this account? ____YES ____NO
                                     B. Have a financial interest in this account? ____YES ____NO

18. If you have answered YES to any of the above, please give name(s) and phone of person(s):

19. Is there currently pending or has there ever been any litigation, disputed accounts or other unresolved matters between commodity or securities brokers, exchanges, or federal or state regulatory bodies and you (or your officers or directors if a corporate customer)?

____YES ____NO If YES, please describe _____

Please note the following:

1. When opening a general partnership please have each partner fill out a customer information sheet on page two of this booklet.

2. Please include a copy of your partnership agreement.

## TRUST ACCOUNT

Trust documents must be enclosed.                                    E-mail Address _____
1. Name of Trust_____          Federal Tax ID# _____
2. Trust's Address _____
3.       City _____ State____ Zip _____ Country_____
                              Do Not Provide P.O. Box. Refer to line #4 & 5.
4. Mailing address if different from above _____
5. City _____ State____ Zip _____ Country_____
6. Name of authorized Trustee(s) _____
7. Telephone Number _____
8. Bank Reference _____ Account Number _____
9. Bank Address _____ City _____ State____ Country_____
10. Annual Income $_____ Less than $25,000 ___$25,000-$50,000 ___$50,000-$100,000 ___Over $100,000
11. Net Worth $_____ Less than $50,000 ___$50,000-$100,000 ___$100,000-$250,000 ___$250,000-$499,999
                 $___$500,000-$999,999 ___$1,000,000+
12. Does the Trust now, or did it ever, have an interest in a commodities account? ____ Yes ____ No
13. Name of Firms traded with: _____
14. Will this account be traded on your behalf by anyone other than a Trustee?___YES ___NO (If YES complete pages 14 & 15)
15. Does any other person/entity:   A. Control the trading of this account? ____YES ____NO
                                    B. Have a financial interest in this account? ____YES ____NO
16. If you have answered YES to any of the above, please give name(s) and phone of person(s): _____
17. Is there currently pending or has there ever been any litigation, disputed accounts or other unresolved matters between commodity
or securities brokers, exchanges, or federal or state regulatory bodies and you (or your officers or directors if a corporate customer)?

____YES ____NO If YES, please describe _____

**Please note the following:**
1. When opening a Trust account please have each Trustee fill out a customer information sheet on page 2 of this booklet.
2. Please include a copy of your Trust document.

## TRUST AUTHORIZATION

The undersigned Trustee warrants and represents that:
(1) The Trust is a duly formed and existing trust under the laws of the state of its formation and the party(ies) designated as trustee(s)
thereof on the Account Application constitute(s) all of the (the only) proper trustee(s) thereof;
(2) Trading in futures contracts is a proper purpose of the Trust, and it is within the Trust's power and such activity will in no manner
contravene the provisions of the Trust Agreement, any statutes, rules or regulations, judgments, orders or decrees or agreements
to which the Trust is bound or subject;
(3) Person(s) designated in the Account Application as having authority to act on behalf of the Trust, shall be duly authorized to exe-
cute this Client Agreement and all related documents on behalf of the Trust and to act for the Trust in all matters regarding the
Trust's account(s). Alaron may at all times rely on the fact of such authority without any duty to investigate either the authenticity
or extent thereof; and
(4) The Trustee, or other person authorized to act on behalf of the Trust or Plan, agrees to indemnify and hold harmless Alaron, its
affiliates, agents, employees, successors and assigns, from and against any and all liabilities, losses, damages, costs and expens-
es, including reasonable attorneys fees, incurred by alaron arising out of the actions of Trustee with respect to the Trust or Plan.

Signature: _____
Print Name: _____
Date: _____

(Please attach copy of applicable authorization agreement and/or Trust/Plan document.)
(Attach additional signature blanks if necessary.)

**READ THIS ENTIRE AGREEMENT BEFORE SIGNING.** In consideration for Alaron Trading Corporation acting as FCM for the Undersigned in the purchase and sale of commodity futures contracts, commodity option contracts, cash commodities and all other transactions related thereto (hereinafter "Commodity Interests"), the Undersigned agrees as follows:

**1. Agency.** Customer authorizes FCM to purchase and sell Commodity Interests for Customer's account in accordance with Customers' oral, written or electronic instructions as given to FCM by Customer's Introducing Broker ("IB") or Associated Person ("AP") or Floor Broker. Customer authorizes FCM, for the accounts of Customer, to make such advances and expend such monies, and whenever possible to borrow and deliver such monies or securities or properties as may be required with respect to such transactions. All orders to buy or sell Commodity Interests must be complete and contain the following information: (a) Whether such order is a buy or sell order; (b) Customer's identity and account number; (c) Commodity Interest; (d) Quantity; (e) Price, if applicable; (f) Contract delivery month; (g) Any special instructions.

**2. Margins.** Customer shall deposit with FCM sufficient funds to meet the applicable initial and maintenance margin requirements. FCM may reject any order if Customer does not have sufficient margin on deposit and may delay the processing of any order while determining the correct margin status of Customer's account. Customer shall, without notice or demand, maintain adequate margins at all times so as to continuously meet the margin requirements established by FCM. FCM may establish margin requirements and from time to time change such margin requirements in its sole and absolute discretion and said requirements may exceed the margin requirements set by any commodity exchange or other regulatory authority. Customer agrees, when requested by FCM, to immediately wire transfer funds to adequately maintain margins and to furnish FCM with the names of bank officers for immediate confirmation of such transfers. Choosing not to demand wire transfer of funds or the acceptance of funds by mail shall not constitute a waiver of the right of FCM to demand wire transfer of funds at any time. If at any time Customer's account does not contain the amount of margin required, FCM may, in its sole and absolute discretion, without notice or demand to Customer, close out Customer's open position(s) in whole or in part or take any other action it deems necessary to satisfy such margin requirements. Failure of FCM to close out open position(s) in whole or in part in such circumstances shall not constitute a waiver of its rights to do so at any time thereafter, nor shall FCM be subject to any liability to Customer for its acts or its failure to so act.

**3. Treatment of Funds.** Customer will maintain two accounts (2) on the books of the FCM. One designated "Regulated" where all transactions designated as regulated by the Commodity Futures Trading Commission ("CFTC") will be carried and the other designated "Nonregulated" where all other transactions will be carried. FCM is hereby authorized to transfer funds as it deems necessary between these accounts.

**4. Indemnification.** Customer agrees to pay all debit balances and interest on debit balances at the rate of eight percent (8%) for the entire period the debit shall exist. Customer further agrees to indemnify and hold FCM harmless against and from any and all deficits, losses, costs and damages (including costs and attorney's fees incurred in collecting such) sustained by FCM resulting, directly or indirectly, from any action or omission by Customer with respect to the account(s), including but not limited to, any debit balances which may occur in Customer's account, taxes that FCM may be required to pay on any commodity interest or other property held in the accounts of the Customer or fine or penalty that FCM may be required to pay because Customer caused FCM to violate any statute, regulation or rule of any exchange or regulatory body.

**5. Reimbursement.** In the event Customer institutes any action, proceeding or claim of any nature whatsoever against FCM, and FCM is successful, either totally or partially, in defending such action, proceeding or claim, Customer shall reimburse FCM, upon demand, for all costs and expenses (including reasonable attorneys fees) incurred by FCM in defending such action, proceeding or claim. It is further agreed that Customer shall reimburse FCM on demand for any and all costs or expenses incurred by FCM in collecting any amounts due from Customer to FCM hereunder.

**6. Acknowledgment Risks.** Customer acknowledges that Commodity Interests trading is a highly speculative activity involving highly leveraged and rapidly fluctuating markets. Despite such risks, Customer is willing and able to assume the financial risks and other hazards of Commodity Interests trading and agrees that Customer will in no manner hold FCM responsible for losses incurred by following IB's or FCM's trading recommendations or suggestions and expressly hereby waives any claims therefor. Customer has read and understands the Risk Disclosure Statement.

**7. Commission Fees.** Customer agrees to pay to FCM any fees and/or commission charges in effect from time to time and other costs to FCM occasioned by carrying the account of Customer. Customer agrees that FCM may debit Customer's account for customary brokerage and commission charges and for charges for any other services rendered by FCM, including all payments made on behalf of Customer. Which charges may vary from time to time, without notice to Customer. Customer agrees to pay any additional fees or commissions charged for taking and/or making deliveries, interest, fees levied by the Regulatory authorities and commissions and fees charged for the transfer of the Customer's account to another FCM.

**8. Interest.** In accordance with CFTC Regulation 1.29, the FCM may receive and retain as its own any increment or interest resulting from the proper investment of the funds held in the Customer's account.

**9. Security Interest.** Customer grants FCM a security interest in all monies, securities, negotiable instruments, open positions in Commodity Interests and all receipts or other documents representing underlying commodities, including without limitation warehouse receipts, and all commodities represented by such receipts or other documents or other property now or at any future time held in Customer's account or which may be in FCM's possession for any purpose, including safekeeping, to secure payment of all obligations of Customer to FCM irrespective of the number of accounts Customer may have with FCM. FCM may at any time, in its sole and absolute discretion, liquidate any of the above-mentioned items in order to satisfy any margin or account deficiencies including but not limited to debit balances resulting from transactions executed by the FCM for the Customer, interest charges, service charges, expenses incurred by FCM, including court costs and attorney's fees incurred in collecting debit or deficit balances of Customer in any account and may transfer said property or assets to the general ledger account of FCM or pledge, transfer or lend such items, all without liability on the part of FCM to Customer or any third party. Furthermore, FCM is also granted a security interest on all proceeds which now or at any time may come into the Customers account, and the Customer agrees to execute any and all documents including Uniform Commercial Code financing statements, deemed necessary or advisable by FCM to evidence or perfect such security interest. FCM shall also have full authority to set off, in addition to other rights set forth in this Agreement, all debts owing to the FCM by the Customer against any and all claims which the Customer may have against the

8

FCM. Customer agrees that all demands for debits owing FCM shall be met within twenty-four (24) hours following either of (i) Customer's receipt of FCM's oral request for payment or (ii) FCM's delivery to Customer of FCM's written request for payment (except as payment modified with respect to wire and telephone requests for margin funds as herein set forth).

**10. Deliveries/Failure to Deliver.** At least two days prior to the first notice day in the case of long positions in futures or forward contracts and at least two business days prior to the last trading day in the case of short positions in futures or forward contracts, Customer agrees either to give FCM instructions to liquidate or make or take delivery under such futures or forward contracts. Customer understands and acknowledges that additional risks exist when participating in the delivery process. As such, Customer agrees to deposit such additional funds as FCM requires and provide any documents FCM deems necessary including, but not limited to, proof of ability to accept or make delivery. Alaron may require Customer to maintain 100% of the underlying cash value of a contract prior to its expiration. Should such margin or documentation not be received, FCM may exercise its right to liquidate such positions in such contracts. Any such liquidation shall be performed at FCM's sole discretion.

If at any time Customer shall be unable to deliver to FCM any security, commodity or other property previously sold by FCM on Customer's behalf, Customer authorizes FCM, in FCM's sole discretion, to borrow or buy and deliver the same, and Customer shall immediately pay and indemnify FCM for any costs, interest, losses and damages (including consequential costs, losses and damages) which FCM may sustain from its inability to borrow or buy any such security, commodity or other property. In the event FCM takes delivery of any security, other property or commodity for Customer's account, Customer agrees to indemnify and hold FCM harmless from and against any loss it may suffer resulting, directly or indirectly, from any decline in value of said security, commodity or other property.

**11. Market Information.** Customer acknowledges that (a) any market recommendations or information communicated to Customer do not constitute an offer to sell or the solicitation of an offer to buy any Commodity Interest; (b) any books, pamphlets or other information regarding market conditions or recommendations of the profitability of any particular trade or trades Customer may receive from FCM is deemed by FCM to have been obtained from sources believed to be reliable; and © FCM and the IB make no representation, warranty, or guarantee as to, and shall not be responsible for the accuracy or completeness of, any information or trading recommendations furnished to Customer. Customer understands that FCM, its affiliates or representatives, and/or the IB may have a position in and may intend to buy or sell Commodity Interests which are the subject of market recommendations furnished to Customer, and that the market position of FCM or any such affiliate or representative and/or the IB may or may not be consistent with the recommendations furnished to Customer by FCM and/or the IB.

**12. Government and Exchange Rules.** All transactions under this Agreement shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings and interpretations of the exchanges or markets on which such transactions are executed by FCM for Customer's account and, where applicable, to the provisions of the Commodity Exchange Act, as amended, and the rules and regulations promulgated there under and to any other applicable government statutes, rules and regulations, and to the rules and regulations of the NFA.

**13. Exchanges.** Unless otherwise specified, FCM is authorized to execute such orders upon any exchange or other place which may be deemed by FCM, in its sole discretion, to be most desirable.

**14. Liquidation of Accounts.** In the event (a) of Customer's death or, in the case of a joint account, the death of the last survivor thereof; (b) of a decision to dissolve and/or liquidate by a corporate Customer, which decision shall be immediately communicated to FCM; (c) of the filing of a petition of Bankruptcy by or against Customer; (d) of the institution of any similar state, federal or other insolvency proceedings by or against Customer; (e) of the appointment of a receiver for Customer or for any of the assets of Customer; (f) an attachment is levied against Customer's account (or any of them); (g) a notice of levy with respect to Customer's account (or any of them) is served on FCM by any competent taxing authority; (h) Customer fails to timely meet any margin calls; (i) information provided by Customer on Account Application is found to be false; or (j) FCM, for any reason whatsoever, deems itself insecure or if necessary for FCM's protection, then FCM is hereby authorized, in its sole discretion, to sell any or all of the Commodity Interests or other property of Customer which may be in FCM's possession, or which FCM may be carrying for Customer, or to buy in any Commodity Interests or other property of which the account or accounts of Customer may be short, or cancel any outstanding orders, in order to close out the account or accounts of Customer in whole or in part or in order to close out any commitment made on behalf of Customer all without any liability on the part of FCM to Customer, or any third party. Such sale, purchase or cancellation may be made according to FCM's judgment and may be made at its sole discretion, on the exchange or other market where such business is usually transacted, without notice to Customer or the legal representative of Customer, and FCM may purchase the whole or any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency, it being understood that a prior tender, demand or call of any kind from FCM, or prior notice from FCM, of the time or place of such sale or purchase shall not be considered a waiver of Brokers rights to sell or buy any Commodity Interests or other property held by FCM or owned by Customer, at any time as hereinbefore provided or to be deemed to require any such tender, demand, call or notice on any subsequent transaction. Further, FCM may, at its option, cause a whole or partial liquidation of Customer's account or the straddling of existing open positions in the event they cannot be satisfactorily liquidated because the market is up or down the limit.

**15. Assignment.** The FCM may assign the Customer's account or accounts to another registered FCM by notifying the Customer of the date and name of the intended assignee FCM ten (10) days prior to the assignment. Unless the Customer objects to the assignment in writing prior to the scheduled date for the assignment, the assignment will be binding on the Customer.

**16. Notice.** All communications, reports, statements, monies, securities, negotiable instruments, and other property shall be mailed or otherwise transmitted to Customer at Customer's account mailing address as shown on the Customer Agreement or to such other address as may have theretofore been designated in writing, and all communications so sent, whether by mail, telegraph, messenger or otherwise, shall be deemed received by Customer personally at the time so sent whether actually received or not.

**17. IB as Third Party Beneficiary.** Customer hereby agrees that any Introducing Broker utilized by the Customer under the Agreement shall be a third-party beneficiary under the Agreement and that the obligations of Customer under the Agreement as they relate to FCM or IB shall be directly enforceable by IB as against Customer.

9

**18. Events Beyond Control of FCM.** FCM shall not be responsible for any loss or damage caused directly or indirectly, by any events, actions or omissions beyond the control of FCM, including without limitation, loss or damage resulting, directly or indirectly, from any delays or inaccuracies in the transmission of orders or other information due to a breakdown in or failure of any transmission or communication facilities.

**19. All Reports Final.** Reports of executions and all statements of account rendered by FCM from time to time to Customer shall be conclusively deemed correct and final, unless Customer gives telephonic or telegraphic notice to the contrary, not later than forty-eight (48) hours after receipt by Customer of information. Margin calls shall be conclusively deemed correct and final if not objected to immediately by telephone or wire. ALL SUCH OBJECTIONS MUST BE DIRECTED BY TELEGRAPH OR TELEPHONE TO AN EXECUTIVE OFFICER AT THE FCM'S EXECUTIVE OFFICE LOCATED AT 822 W. Washington, Chicago, Illinois 60607. Statements, equity runs or other account data sent or transmitted by anyone other than FCM (i.e. IBs, CTAs, etc.) may be inaccurate. Customer agrees to hold harmless FCM for any losses or damages he/she may incur as a result of requesting and/or receiving account information from anyone other than FCM.

**20. Online/Electronic Trading.** Customer acknowledges all information received and orders placed through FCM via electronic or online means (here-inafter "System") are at Customer's sole risk. Customer understands that orders which are sent directly to the floor may not stop at Customer's broker or order desk to be reviewed. As a result, errors made in the transmission of the order are the responsibility of Customer. Further, if orders are sent directly to the trading floor (or to an electronic trading system) Customer acknowledges that there are limits set by commodity on the maximum number of con-tracts on an order going directly to the floor.

FCM reserves the right to require a margin deposit prior to the execution of any order placed electronically or via online means. If any order which cus-tomer enters places his/her account in an undermargined condition, FCM's margin policy applies. FCM will not be responsible for any delay or failure to provide online or electronic service, including the execution of any order, in the event that there is a restriction on your account or you delay or fail to make such a margin deposit.

Customer further acknowledges that FCM may terminate Customer's access to the System, or any portion thereof, or, place restrictions upon Customer's trading account, for reasons FCM in its sole discretion, may deem necessary, including but not limited to, Customer's account being under-margined or in a deficit position; FCM finding that the data contained in Customer's account application is false or no longer valid; Customer's breach of this Agreement; or, the unauthorized use of Customer's account number or other password(s). Customer understands that if there is a restriction on his/her trading account, (s)he will not be able to use the system's online/electronic trading function.
Customer agrees to immediately notify FCM of any loss or theft of Customer's account number or password for entry into the System. Customer further agrees to immediately notify FCM of any inaccurate account information in any report Customer receives while accessing online/electronic services.

**21. Binding Effect.** This Agreement, including all authorizations, shall inure to the benefit of FCM, its successors and assigns and shall be binding upon Customer and Customer's personal representatives, executors, trustees, administrators, successors and assigns.

**22. Modification.** This Agreement may be altered, modified or amended by FCM from time to time by written notice to Customer unless Customer shall object within three (3) business days of receipt thereof to such modification, alteration or amendment. No other modification, amendment or addition to this Agreement shall be effective unless reduced to writing and signed by both Customer and a duly authorized representative of the FCM. This instru-ment embodies the entire Agreement of the parties, superseding any and all prior agreements and there are no terms, conditions or obligations other than those contained herein

**23. Trading Representations.** The Customer understands that on certain trading days, trading in certain commodities, commodity options, leverage contracts and underlying commodities or futures contracts may cease or expire and that, with respect to commodity options and underlying commodities or futures contracts traded outside the United States, trading days and hours may not coincide with domestic trading days or hours and that these may result in financial disadvantage to Customer. The Customer hereby agrees to hold FCM, FCM's officers, partners, and agents including the IB harmless against such loss.

**24. Further Representations.** The Customer represents, warrants and agrees that: (a) All of the information contained on the Customer Agreement is true, correct and complete as of the date hereof and since FCM is relying thereon undersigned will promptly notify the FCM of any changes herein; (b) Trading in Commodity Interests is within the power of the Customer and such activity will in no matter contravene the provisions of any statutes, rules or regulations, judgments, orders or decrees or agreements to which the Customer is bound or subject; © If Customer is a corporation, it is duly organized and in good standing under the laws of the state of its incorporation and every state in which it does business; (d) The actions of the authorized person designated on the Customer Agreement to act for the Customer has been authorized by all necessary or appropriate corporate action if applicable, such person has full authority to execute this Customer Agreement and all related documents on behalf of the Customer and to act for Customer in all matters regarding Customer's account(s) and FCM may at all times rely on the fact of such authority without any duty to investigate into either the authenticity or extent thereof; (e) If applicable, Customer will confirm the matters contained in paragraph 23(d) by supplying FCM, within a reasonable time, prior to the commencement of trading, with an executed copy of resolutions of the Board of Directors of Customer in a form prescribed by FCM; (f) If Customer is a partnership, the partnership has express authority to speculate in Commodity Interests; and (g) Customer has never been suspended or barred from trading by the CFTC or any predecessor agency or any other federal or state regulatory agency or any exchange or a trade association, and Customer undertakes to notify FCM of any change in such status within two (2) business days of any such change; (h) Customer will not commence any legal or administrative proceeding against FCM or its agents until any deficit balance in Customer's account(s) is satisfied.

**25. Verification.** Customer authorizes FCM to contact such banks, financial institutions and credit agencies as FCM shall deem appropriate from time to time to verify the information regarding Customer which may be provided by Customer from time to time. Customer understands that an investigation may be made pertaining to his personal and business credit standing and that Customer may make written request within a reasonable period of time for disclosure of such investigation's nature and scope.

**26. Conversion Rate Risk.** In the event that FCM is directed to enter into any Commodity Interest contract on any exchange or board of trade involving transactions effected in a foreign currency: (a) any profit or loss arising as a result of a fluctuation in the rate of exchange affecting such currency will be entirely for the Customer's account and risk; (b) be made in U.S. Dollars in such amounts as FCM may, in its sole discretion require, and © FCM has the sole discretion to
convert funds in Customer's account into and from such foreign currency at a rate of exchange determined by FCM as it deems necessary and proper and on the basis of then prevailing money markets.

**27. Telephone Recording.** Customer acknowledges, authorizes and consents to the recording of Customer's telephone conversations with FCM or any of its agents or associated persons by means of electronic recording devices with or without the use of an automatic tone warning device. Customer understands, authorizes and consents to the use of such recordings, and/or transcripts thereof, as evidence by either party in any action arising out of this Agreement. This paragraph authorizes both parties to record, but does not require either party to do so. FCM may, but shall not be required, in its normal course of business, to erase such recordings 7 days following their production.

**28. Joint Account.** If this is a joint account, the Customers agree, jointly and severally, that the foregoing Agreement and all matters contained herein are the joint and several rights and obligations of the Customer. Each of the Customers has the authority to act on behalf of the joint account as if s(he) alone were interested therein all without notice to the others interested in said account, including but not limited to conferral or revocation of authority hereunder. All property of any one or more of the Customers held or carried by FCM shall be as collateral security and with a general lien thereon for the payment of debts, losses or expenses incurred in the joint account and vice versa, however arising. In the event of death or legal incapacity of any of the Customers, the survivor(s) immediately shall give FCM notice and FCM may, before or after receiving such notice, take such action, require such documents, retain such assets and/or restrict transactions as FCM deems advisable to protect FCM. Liability of the Customer hereunder shall pass to any estate or personal representative of the Customer. This joint account can be opened as "Tenants in Common" or with right of survivorship. "Tenants in Common" means upon death of any of the Customers the FCM will divide the joint account into separate equal accounts in each of the Customers' respective names, but Customers shall continue to be liable on the joint account hereunder until FCM has received actual notice of such death or incapacity. "With right of survivorship" means, upon death of any of the Customers, the survivor(s) shall be vested with this joint account, subject to notice and ability as aforesaid. If no instruction is given above, the Customers shall be deemed Joint Tenants with Right of Survivorship.

**29. Lending Agreement.** Should Customer take delivery of commodities through futures contracts, FCM is obliged to make full payment for the delivery on 24 hours notice. If the balance in Customer's account is not adequate to pay for the delivery, the warehouse receipts (representing the delivery) become property carried on margin in Customer's account, since they are not fully paid for by Customer. The purpose of the lending agreement is to allow FCM to use the warehouse receipts as collateral for a bank loan, the proceeds of which are used to pay for the warehouse receipts until re-delivery of the commodity and/or payment in full by Customer. Customer hereby authorizes FCM from time to time to lend, separately or together with the property of others, either to itself or to others, any property which FCM may be carrying for the undersigned on margin. This authorization shall apply to all accounts carried by FCM for the undersigned and shall remain in full force until written notice of revocation is received by FCM at FCM's principal office.

**30. Authorization To Transfer, Liquidate And Apply Funds.** Until further notice in writing from the undersigned, FCM is hereby authorized at any time and from time to time, without prior notice to the undersigned, to transfer from any account or accounts of the undersigned maintained at FCM or any exchange member through which FCM clears customer transactions, such excess funds, securities, commodities, commodity futures contracts, commodity options, and other property of the undersigned as in FCMs sole judgment may be required for margin in any other such account or accounts or to reduce or satisfy any debit balances in any other account or accounts provided such transfer or transfers comply with relevant governmental and exchange rules and regulations applicable to the same. FCM is further authorized to liquidate any property held in any such account or accounts of the undersigned whenever in FCM's sole judgment such liquidation is necessary in order to effectuate the above authorized transfer and application of property. Within a reasonable time after making any such transfer or application, FCM will confirm the same in writing to the undersigned.

**31. Disclosure Statement For Non-Cash Margin.** THIS STATEMENT IS FURNISHED TO YOU BECAUSE RULE 190.10.(C) OF THE COMMODITY FUTURES TRADING COMMISSION REQUIRES IT FOR REASONS OF FAIR NOTICE UNRELATED TO THIS COMPANY'S CURRENT FINANCIAL CONDITION. 1.YOU SHOULD KNOW THAT IN THE UNLIKELY EVENT OF THIS COMPANY'S BANKRUPTCY, PROPERTY, INCLUDING PROPERTY SPECIFICALLY TRACEABLE TO YOU, WILL BE RETURNED, TRANSFERRED OR DISTRIBUTED TO YOU, OR ON YOUR BEHALF, ONLY TO THE EXTENT OF YOUR PRORATA SHARE OF ALL PROPERTY AVAILABLE FOR DISTRIBUTION TO CUSTOMERS. 2. NOTICE CONCERNING THE TERMS FOR THE RETURN OF SPECIFICALLY IDENTIFIABLE PROPERTY WILL BE BY PUBLICATION IN GHE NEWSPAPER OF GENERAL CIRCULATION. 3. THE COMMISSION'S REGULATIONS CONCERNING BANKRUPTCIES OF COMMODITY BROKERS CAN BE FOUND AT 17 CODE OF FEDERAL REGULATIONS PART 190.

**32. Repurchase Agreements.** With respect to United Sates Treasury Bills or other securities Customer may deposit as margin with FCM, Customer specifically authorizes FCM to enter into purchase arrangements with bank and other
financial institutions which recognize both the proceeds of the sale and Customer's repurchase rights as Customer assets that must be kept segregated by FCM pursuant to the Commodity Exchange Act, as amended, and the rules retain the income earned on the Treasury Bill(s) or other securities he has deposited. FCM shall be responsible for any difference between the purchase price paid by the bank or other financial institution and the repurchase price paid by FCM.

**33. No Guarantees.** Customer acknowledges that he has no separate agreement with his broker or any FCM employee or agent regarding the trading in his commodity account, including any agreement to guarantee profits or limit losses in his account. Customer understands that he is under an obligation to notify FCM's Compliance Officer immediately in writing as to any agreement of this type. Further, Customer understands that any representations made by anyone concerning his account which differ from any statements he receives from FCM must be brought to the attention of FCM's Compliance Officer immediately in writing. Customer understands that he must authorize every transaction prior to its execution unless he has delegated discretion to another party by signing FCM's limited trading authorization, and any disputed transactions must be brought to the attention of FCM's Compliance Officer pursuant to the notice requirements of this Customer Agreement.

11

Customer agrees to indemnify and hold FCM harmless from all damages or liability resulting from his failure to immediately notify FCM's Compliance Officer of any of the occurrences referred to herein. All notices required under this section shall be sent to FCM at its address appearing on confirmations and account statements.

**34. Acknowledgement By Customers Of IB s And Commodity Trading Advisors ("CTA").** If Customer account is introduced by IB or by CTA, it is being carried on FCM's books on a "fully disclosed basis." Customer understands that FCM is employed to perform certain bookkeeping and operational functions with regard to Customer's account. Customer understands that FCM is responsible for executing and confirming transactions effected for Customer's account; segregating funds in accordance with the rules and regulations promulgated by the CFTC; and margining Customer's account as well as mailing Customer statements and reports of all transactions. IB or CTA is responsible for entering orders for Customer's account and risk; supervising sales practices; and collecting funds on Customer's behalf by means of checks payable to FCM only.

**35. Futures Account.** Mutual Offset System Authorization and Disclosure Statement. This statement. This statement is furnished to you because Rule 874 of the Chicago Mercantile Exchange requires it.

ALARON TRADING CORPORATION MAY FROM TIME TO TIME EXECUTE TRANSACTIONS AS CUSTOMER'S AGENT ON A FOREIGN FUTURES EXCHANGE WHICH PARTICIPATES WITH THE CHICAGO MERCANTILE EXCHANGE IN TRADING IDENTICAL CONTRACTS PURSUANT TO THE MUTUAL OFFSET SYSTEM.  PARTICIPATION IN THE MUTUAL OFFSET SYSTEM INVOLVES THE EXECUTION AND CLEARING OF TRADES ON A FOREIGN EXCHANGE NEITHER THE CHICAGO MERCANTILE EXCHANGE NOR THE COMMODITY FUTURES TRADING COMMISSION REGULATES ACTIVITIES SUBJECT TO THE RULES OF A FOREIGN EXCHANGE, INCLUDING THE EXECUTION, DELIVERY AND CLEARING OF TRANSACTION ON SUCH EXCHANGES. SIMILARLY, NEITHER THE COMMISSION NOR THE CHICAGO MERCANTILE EXCHANGE MAY HAVE THE POWER TO SECURE ENFORCEMENT FORM THE FOREIGN EXCHANGE OR ITS MEMBERS, OR TO COMPEL ENFORCEMENT OF ANY APPLICABLE FOREIGN LAWS BY THE FOREIGN GOVERNMENTAL AUTHORITIES IF THERE ARE VIOLATIONS OF, OR NONCOMPLIANCE WITH, THE RULES OF THE FOREIGN EXCHANGE OR THE LAWS OF THE FOREIGN COUNTRY. FOR THESE REASONS CUSTOMERS WHO TRADE PURSUANT TO THE MUTUAL OFFSET SYSTEMS WILL NOT BE AFFORDED CERTAIN OF THE PROTECTIVE MEASURES PROVIDED BY THE COMMODITY EXCHANGE ACT, THE COMMISSION'S REGULATIONS, AND THE RULES OF THE CHICAGO MERCANTILE EXCHANGE. THE PROTECTIVE MEASURES WHICH MAY NOT BE AVAILABLE TO SUCH CUSTOMERS INCLUDE REPARATION PROCEEDINGS BEFORE THE COMMISSION AND ARBITRATION PROCEEDINGS BEFORE THE NATIONAL FUTURES ASSOCIATION OR CHICAGO MERCANTILE EXCHANGE.

**36. Jurisdiction, Venue And Waiver Of Jury Trial.** CUSTOMER AGREES THAT ANY CONTROVERSY BETWEEN FCM AND CUSTOMER ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE MANNER OF RESOLUTION, SHALL BE ARBITRATED, LITIGATED (TRIED IN A COURT OF LAW), OR OTHERWISE RESOLVED BY A TRIBUNAL LOCATED IN CHICAGO, ILLINOIS. IN ADDITION, CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING Customer agrees to pay all expenses, including attorney's fees, incurred by FCM: (a) defend any unsuccessful claim Customer brings against FCM or; (b) to collect any debit balances in Customer account(s). Customer hereby expressly acknowledges that this Agreement is made in the State of Illinois (upon acceptance by FCM), and further, that by virtue of trading commodity futures or options in the account established hereby, Customer is transacting business in the State of Illinois; accordingly, Customer hereby submits and consents to jurisdiction of this person in the Courts of the State of Illinois and, shall be amenable to service of summons and other legal process of, and emanating from, the State of Illinois.

The undersigned Customer hereby understands the Customer Account Agreement and consents and agrees to all of the terms and conditions of the agreement set for above.

Customer here acknowledges that he received and understands the following risk disclosure statements:

    (a) Futures Risk Disclosure Statement required by CFTC Rule 1.55.

    (b) Bankruptcy Disclosure Statement required by CFTC Rule 190.10.

    (c) Options Risk Disclosure Statement required by CFTC Rule 33.7.

    (d) Risk Disclosure Statement for Foreign Futures and Futures and Foreign Options required by CFTC Rule 30.6(a), 15.05 and 21.03.

Customer has read, understood and retained a copy of each of the disclosure statements referenced above (If limited partnership, general or managing partner must sign.  If corporation, President must sign)

X_____     _____
      Customer Signature                                                  Date

X_____     _____
                                                            Date

12



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

uest for Identification Number:
States Citizens, Taxpayer Identification Number. For most individual taxpayers, the taxpayer identification number is the social
mber.

For individual, joint, custodian and sole proprietorship, the social security number is to be used. Only the taxpayer's social securi-
is required. For custodial accounts, use Child's social security number, not custodian's.

CTIONS: Place taxpayer identification number or social security number in box and sign below.

ecurity # _ _ _ _ _ _ _ _ - _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _

cation - Under penalties of perjury, I certify that:
number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
n not subject to backup withholding either because I have not been notified by the Internal Revenue (IRS) that I am subject to
up withholdings as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to
up withholding.

ification Instructions- You must cross out item (2) above if you have been notified by IRS that you are subject to backup withholding
ause of underreporting interest or dividends on you tax return. However, if after being notified by IRS that you were subject to backup
hholding you received another notification from IRS that you no longer subject withholding, do not cross out item (2).

RTIFICATION Under the penalties of perjury, I certify that the information provided on this form is true, correct, and complete for
ction W-9.

_____          _____
Customer Signature                                                          Date

# FOREIGN TRADER*

PLEASE BE ADVISED THAT Regulation 15:05 of the United States Code of Federal Regulations (CFR) establishes Alaron as your Agent
for purposes of accepting delivery and service of any communication issued by or on behalf of the Commodity Futures Trading Commission
(CFTC) to you as a foreign broker or foreign trader with respect to any futures or options contracts which are or have been maintained in
your accounts carried by Alaron Service or delivery of any communication issued by or on behalf of the CFTC to Alaron pursuant to such
agency constitutes valid and effective service or delivery upon the foreign broker, the customer of the foreign broker or the foreign trader.
Also, pursuant to this regulation, in addition to Alaron acting as your agent, your introducing broker, if your account was introduced to
Alaron, shall also be deemed to be your agent for purposes of service and/or delivery of communication.

PLEASE BE FURTHER ADVISED THAT the CFTC, pursuant to Regulation 18:07 CFR, may require any trader located outside of the
United States or its territories to comply with the filing of various reports with the CFTC to file such reports within one business day after
a special call upon such trader by the CFTC.

PLEASE BE FURTHER ADVISED THAT, in the event the CFTC, pursuant to Regulation 21:03 CFR, issues a call for information on the
account of a foreign trader, Alaron, as your agent, may be required to provide any and all information concerning your account as specified
in the above cited regulation, including but not limited to your name and address and the name and address of any person having a ten
percent or more beneficial interest in your account, the total open futures and options position in your account and the number of futures
contracts against which delivery notices have been issued or received or against which exchanges of futures for cash have been transact-
ed for the period of time specified in the call.

I, the undersigned, hereby acknowledge receipt of the above NOTICE TO FOREIGN TRADER and affirm that I have read and understood
its contents.

X_____          _____
Customer Signature                                                          Date

* Non-U.S. customers must complete W-8 forms. Be sure you have downloaded the appropriate W-8 form from the Download
Account Forms page at Alaron.com.

13



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

## Current Bank/Money Market accounts:

_____ Checking ____

Firm _____ Savings ____

City _____ Money Market ____

Account no.(s) _____ Net worth (excluding equity in home): ___ $ 50,000-$ 99,999 ____

$100,000-$249,999 ___ $ 250,000-$499,999 ___ $ 500,000-

$1,000,000 ___ more than $1,000,000 ___ if less than $ 50,000,

please specify exact amount and indicate liquid portion

_____

Annual Income: _____

Years of Experience:

___ Futures

___ Futures Options

___ Stocks

___ Stock Options

___ Bonds

___ Other

Please list the names of the firms traded with: Firm

_____ account ___ open ___ closed Firm

_____ account ___ open ___ closed Firm

_____ account ___ open ___ closed

## _ GUARANTEE

_ull name _____

urity No. _____

rth _____

dress _____

_____ State ____ Zip _____

lephone no. _____

ss telephone no. _____

yer _____

ation _____

ess address _____

_____ State ____ Zip _____

In order to induce Alaron Trading Corporation ("FCM") to enter into the Customer Agreement, to which this Guarantee is attached, with _____, referred to therein as Customer, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby, jointly and severally in the case of multiple guarantors, personally guarantee(s) the prompt, full and complete performance of any and all of the duties and obligations of Customer and the payment of any and all damages, costs and expenses which may become recoverable by FCM from Customer. This guarantee shall remain in full force and effect until the termination of the Customer Agreement; provided, however, that the undersigned shall not be released from his/their obligations hereunder so long as any claim of FCM against Customer which claim arises out of or relates to, directly or indirectly, said Customer Agreement is not settled or discharged in full. All monies, securities, negotiable instruments, open positions in futures contracts, options premiums, commodities or other property now or at any future time that are on deposit with Broker in Guarantor's account, for any purpose, including safekeeping, are hereby pledged with Broker and shall be subject to a security interest in Broker's favor for the discharge of all Guarantor's obligations to Broker. Guarantor also grants Broker the right to use the above described properties to offset and credit against any of Guarantor's obligations to Broker for debit accounts not promptly paid. The undersigned hereby expressly waives notice of acceptance hereof, and of non-performance, in any respect, by Customer of any of its duties or obligations, as aforesaid.

This guarantee shall inure to the benefit of FCM, its successors and assigns, and shall be binding on the undersigned, his/their heirs and assigns.

_____   Relationship to Account Holder

X_____   _____
Guarantor's Signature                Date

X_____
Print Name

14



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

## TE RESOLUTION AND INDEMNIFICATION

_____ , do hereby certify that I am the duly elected and acting

_____ (the "Corporation"), a corporation validly existing under the laws of

_____ , and I do further certify that the following resolutions were duly

of _____ , and I do further certify that the following resolutions were duly

by the Board of Directors of the Corporation in accordance with applicable statutes and the Corporation's Charter and

and that such resolutions have not been rescinded or amended and are now in full force and effect:

EAS, the Corporation has full corporate power and authority under its charter, by-laws and the laws of its domicile to enter

tracts for the purchase, receipt, sale and delivery of commodity futures contracts, options on futures, contracts and

investments;

THEREFORE, IT IS RESOLVED AS FOLLOWS:

LVED, that this Corporation shall open and maintain a trading account with Alaron Trading Corporation for the purpose of

g, and otherwise dealing in, commodities, commodity futures and options contracts and related investments;

OLVED, that the following officers have been duly elected or appointed and are authorized to execute and deliver any and

ontracts, agreements, acknowledgments, disclosure statements and other necessary instruments on behalf of Corporation

quired by FCM to open such account as well as any additional account, and to act on behalf of this Corporation in the

ing of this account or authorize others to so act. Such officers are further authorized to act with regard to all matters

cerning Alaron Trading Corporation.

_____  Title_____

me_____  Title_____

me_____

URTHER RESOLVED, that in order to induce FCM to accept an account in the name of this Corporation, the Corporation agrees to

indemnify and hold FCM, its successors and assigns, harmless against and from any and all loss, damages or liability incurred

ecause any of the above representations or warranties shall, at any time, not be true and correct or the above Agreements shall not

have been fully performed by the Corporation.

Corporation Name _____ Date_____

_____ , a

Authorized Officer's Signature and Title_____  is _____ of _____

I hereby certify that _____ corporation, that he is duly authorized to execute this Agreement on behalf of the Corporation, and

that the above signature is his genuine signature. _____ Date_____

Secretary_____

15



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### OFFICE OF THE CLERK

GREGORY C. LANGHAM
CLERK OF COURT

Room A-105
Alfred A. Arraj United States
Courthouse
901 19th Street
Denver, Colorado 80294
Phone(303) 844-3433
www.cod.uscourts.gov

This is the best quality copy of the following document.

Clerks Office
United States District Court

.RTY CONTROLLER STATEMENT

nal Futures Association (NFA) Rule 2-8 (e) Third Party Account Controllers, requires:

wledgement from the customer that the customer has received a disclosure document from the account controller, or a written .t from the account controller explaining why the account controller is not required to provide a disclosure document to the customer.

sign below acknowledging that you have received this statement:

t required to provide a disclosure document to my customer because I am exempt from registering as a Commodity Trading r (CTA) as indicated below: (Check the exemption which applies)

_____ a) I have provided advice to 15 or fewer persons during the past 12 months and do not hold myself generally to the as a CTA.

_____ b) I am a (1) dealer, processor, broker or seller in cash market transactions or (2) non-profit, voluntary membership, al farm organization, who provides advice on the sale or purchase of commodities, and any trading advice is solely incidental to onduct of my business.

_____ c) I am registered in another capacity and my advice is solely incidental to my principal business or profession.

relationship to the customer is: _____   Occupation _____

rd Party Account Controller Employer _____
                                                                    (State)                    (Zip)

iird Party Account Controller Address _____
                                          (Street)              (City)

_____   Third Party Account Controller Social Security Number
Third Party Account Controller Telephone Number

_____
Third Party Account Controller Signature Date


# ACKNOWLEDGEMENT

_____ acknowledge that _____
                                              (Print Third Party Controller Name)
I, _____
   (Print Customer Name)

is not required to provide me with a disclosure document as explained above.

_____
                                          Date

X _____
  Customer Signature

_____
                                          Date

X _____
  (If joint account, all parties must sign)


16

## MANAGED ACCOUNT AUTHORIZATION

I hereby authorize _____ as my agent and attorney-
(Customer must insert name of account controller)

in-fact to buy, sell (including short sales) and otherwise deal in futures and options contracts and foreign futures and options (collec-
tively "futures contracts") of every kind and nature on margin or otherwise all in his sole discretion and in accordance with your terms
and conditions for my account and risk in my name, or number on your books. I hereby agree to indemnify and hold you harmless
from, and to pay you promptly on demand, any and all losses, costs, indebtedness and liabilities arising there from or debit balance
due thereon.

In all such purchases, sales or trades, you are authorized to follow the instructions of said agent and attorney-in-fact in every respect
concerning my account with you, and he/she is authorized to act for me and in my behalf in the same manner and with the same
force and effects as I might or could do with respect to such purchases, sales or trades as well as with respect to all other things nec-
essary or incidental to the furtherance or conduct of such purchases, sales or trades.

I hereby ratify and confirm any and all transactions with you heretofore or hereafter made by the aforesaid agent on behalf of or for
my account. This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under
any other agreement or agreements between your firm and me. This authorization and indemnity is also a continuing one and shall
remain in full force and effect until revoked by me by a written notice addressed to and actually received by you at your office at 822
W. Washington, Chicago, Illinois 60607, but such revocation shall not affect any liability in any way resulting from transactions initiated
prior to such revocation. This authorization and indemnity shall inure to the benefit of your present firm and of any successor firm or
firms irrespective of any change or changes at any time in personnel thereof for any cause whatsoever, and of the assigns of your
present firm or any successor firm.

I understand that your firm is in no way responsible for any loss to me occasioned by the actions of the individual or organization named
above and that your firm does not, by implications or otherwise, endorse the operating methods of such individual or organization.

X_____        X_____
   Customer Signature                                Date

X_____        X_____
   If joint account, all parties must sign               Date

ACKNOWLEDGED AND ACCEPTED BY:_____
                                           Name of Account Controller

X_____        X_____
   Signature of Account Controller                     Date

_____
Address        (Street)        (City)        (State)  (Zip)                Telephone

Sign below if you want your Commodity Trading Advisor (who must be registered as such with the National Futures Association) to
automatically receive fee payment from your account.

## AUTHORIZATION TO REMIT FUNDS

Customer hereby authorizes Alaron Trading Corp. to remit funds from my/our trading account upon the written presentation and
demand of my Commodity Trading Advisor ("CTA"), as represented by a billing of said CTA. Alaron shall not be responsible for verifi-
cation of the accuracy of such billing statement.

Notwithstanding anything in this authorization to the contrary, Alaron shall have the right to refuse the written demand of the manager
if it is deemed by Alaron in its sole discretion that such a transaction would affect proper margining requirements or would otherwise
not be in the interest of the undersigned.

X_____        X_____
   Customer Signature                                Date

X_____        X_____
   If joint account, all parties must sign               Date

## FOR HEDGE CUSTOMERS ONLY - HEDGE CONFIRMATION LETTER

If joint account or general partnership, all must sign;
If limited partnership account, general or managing partner must sign.

The Customer hereby confirms to FCM that all orders which the Customer gives FCM for the purchase or sale of futures or options con-tracts for these account(s) will represent bona fide hedges, as defined by the CFTC, against spot positions or commitments in accor-dance with 4a(3) of the Commodity Exchange Act, and with any amendments or CFTC interpretations which may be made in the future. Should the undersigned place orders for the purchase or sale of futures contracts which are not hedge transactions, the undersigned thereupon will advise Alaron Trading Corporation. IF THE BOX LABELED "LOB" BELOW IS INITIALED BY THE CUSTOMER, AND SHOULD A TRUSTEE IN BANKRUPTCY EVER BE APPOINTED IN THE FUTURE FOR FCM, THE CUSTOMER HEREBY CONFERS UPON SUCH TRUSTEE THE AUTHORITY TO LIQUIDATE OPEN COMMODITY CONTRACTS HELD IN THE BONA FIDE HEDGE ACCOUNT OF THE CUSTOMER WITHOUT SUCH TRUSTEE SEEKING THE PRIOR INSTRUCTION OF THE CUSTOMER AT THAT TIME. IF NO INITIALS APPEAR IN THE BOX BELOW, YOU WILL INDICATE ON YOUR RECORDS THAT SUCH AUTHORITY HAS NOT BEEN CONFERRED UPON A TRUSTEE IN BANKRUPTCY, IF ONE IS EVER APPOINTED.

List Commodities to be Hedged:

**LOB**

_____   _____   _____

_____   _____   _____

List type of account: ___Commercial ___Noncommercial
**If a commercial account, please indicate (circle) one of the below listed occupation categories.**

| Commodity | Occupation Categories | Commodity | Occupation Categories | Commodity | Occupation Categories |
|---|---|---|---|---|---|
| Sugar | 1. Producer<br>2. Merchant or Dealer<br>3. Refiner<br>4. Manufacturer or Processor | | 19. Pension and Retirement Fund<br>20. Mutual Fund<br>21. Broker/Dealer<br>22. Foundation or Endowment<br>23. Other Commercial<br>24. Importer/Exporter of Goods and Services<br>25. Investor/Issuer of Foreign Currency Denominated Securities | Livestock | 32. Farmer or anchor<br>33. Commercial Feeding Operator<br>34. Other Livestock Feeder<br>35. Marketing Agency and/or Commission Merchant<br>36. Packer or Other Meat Processor<br>27. Meat Wholesaler, Retailer or Buyer<br>38. Other Commercial |
| Precious Metals | 5. Other Commercial<br>6. Producer<br>7. Refiner<br>8. Dealer<br>9. Commercial End User<br>11. Other Commercial | | | | |
| Petroleum | 39. Crude Oil Producer<br>40. Crude Oil Reseller<br>12. Refiner<br>13. Product Marketer and/or Distributor<br>14. End User<br>15. Other Commercial | Grains and Soybeans | 26. Grain or Soybean Producer<br>27. Producer Cooperative<br>28. Elevator Operator or Merchant<br>29. Processor, Including Feed Manufacturing and Crushing<br>30. Livestock Feeder or Producer<br>31. Other Commercial | Cotton | 41. Producer<br>42. Producer Cooperative<br>43. Merchant<br>44. Mill Operator<br>45. Other Commercial |
| Financial Instruments | 16. Savings and Loan, Mortgage Bank or Thrift Institution<br>17. Commercial Bank<br>18. Insurance Company | | | Random Length Lumber | 48. Producer<br>49. Remanufacturer<br>50. Wholesaler<br>51. Retailers and Builders<br>52. Other Commercial |

X_____   X_____
  Customer Signature                                                       Date

X_____   X_____
  Customer Signature                                                       Date

## ACCOUNT MAINTENANCE FEE POLICY

ALARON TRADING CORPORATION MAY CHARGE AN ACCOUNT MAINTENANCE FEE OF $10 PER MONTH, BILLED ON A QUARTERLY BASIS IMMEDIATELY FOLLOWING THE LAST DAY OF THE QUARTER. ACCOUNTS WILL BE EXEMPT FOR THE FULL $30.00 QUARTERLY CHARGE IF AN ACCOUNT HAS GENERATED GROSS COMMISSIONS IN EXCESS OF $2500.00 IN THE PREVIOUS QUARTER; OR, A CALENDAR YEAR TOTAL THAT IS EQUIVALENT TO ACCUMULATIVE RATE OF $2500.00 IN GROSS COMMISSIONS PER QUARTER.

IF ON THE LAST DAY OF THE MONTH, THE ACCOUNT HAS A BALANCE OF LESS THAN THE $30.00, THE ACCOUNT SHALL BE DEBITED IN THE AMOUNT OF SUCH BALANCE REPRESENTING THE QUARTERLY FEE.
ONLY ONE ACCOUNT PER CUSTOMER WILL BE CHARGED. RELATED ACCOUNTS WILL BE CONSIDERED AS ONE.
HOTLINE SERVICE FEE POLICY

ALL HOTLINE SERVICES OFFERED THROUGH ALARON TRADING CORPORATION ARE AVAILABLE ON INFOLINE FOR A SER-VICE CHARGE OF $.50 PER PHONE CALL PLUS $1.50 PER MINUTE OR PART THEREOF, TO BE CHARGED AGAINST THE ACCOUNT AS INCURRED. CUSTOMERS AVAILING THEMSELVES OF ANY HOTLINE HEREBY: (1) ACKNOWLEDGE, UNDER-STAND AND AGREE THAT ANY AND ALL INFORMATION PROVIDED THEREIN OFFERS SPECULATIVE OPINIONS AS TO MARKET CONDITIONS WHICH ARE NOT NECESSARILY THOSE OF ALARON TRADING CORPORATION; (2) ASSUME FULL RISK FOR ANY ACTION TAKEN IN RELIANCE ON SAID OPINIONS; AND (3) AGREE TO HOLD HARMLESS ALARON TRADING CORPORATION, THE HOTLINE SERVICE PROVIDER, AND THEIR RESPECTIVE EMPLOYEES, AGENTS AND ASSIGNS FROM ANY AND ALL LIA-BILITY OR DAMAGE, CONTINGENT OR OTHERWISE, ARISING FROM CUSTOMERS' USE OF ANY HOTLINE SERVICE.

I (WE) THE UNDERSIGNED CUSTOMER ACKNOWLEDGES THAT I (WE) HAVE RECEIVED, READ AND UNDERSTOOD THE FOREGOING ACCOUNT MAINTENANCE FEE POLICY.

**NOTE:** If joint account or general partnership, all persons must sign.
If this is a limited partnership account, the general or managing partner must sign.

Customer Signature(s)                                    Print Name(s)
X_____      X_____

X_____      X_____

X_____      X_____

Date: _____

## CONSENT TO ELECTRONIC TRANSMISSION OF STATEMENTS

I consent to any and all statements generated for my account on a daily and monthly basis ("Statements") delivered to me electroni-cally, and waive any rights to the mailing or other personal delivery of said statements to the address I have provided on my Alaron Trading Corporation Customer Account Application.

My consent is effective until revoked, in writing. In the event that Alaron is unable to transmit my statements electronically, Alaron will send them to me by U.S. mail.

I would like my Statements sent to me, electronically, to the following address:

_____
Provide E-mail address or Provide Fax Number

Alaron will not be responsible for any failure or inability to electronically deliver Statements due to electronic failures, a breakdown in, or failure of any transmission or communication facilities.

X_____   Date:_____

X_____   Date:_____   Alaron Trading

Alaron Trading Corporation
## OPTIONS DISCLOSURE STATEMENT

BECAUSE OF THE VOLATILE NATURE OF THE COMMODITIES MARKETS, THE PURCHASE AND GRANTING OF COMMODITY OPTIONS INVOLVE A HIGH DEGREE OF RISK. COMMODITY OPTION TRANSACTIONS ARE NOT SUITABLE FOR MANY MEMBERS OF THE PUBLIC. SUCH TRANSACTIONS SHOULD BE ENTERED INTO ONLY BY PERSONS WHO HAVE READ AND UNDERSTOOD THIS DISCLOSURE STATEMENT AND WHO UNDERSTAND THE NATURE AND EXTENT OF THEIR RIGHTS AND OBLIGATIONS AND OF THE RISKS INVOLVED IN THE OPTION TRANSACTIONS COVERED BY THIS DISCLOSURE STATEMENT. BOTH THE PURCHASER AND THE GRANTOR SHOULD KNOW WHETHER THE PARTICULAR OPTION IN WHICH THEY CONTEMPLATE TRADING IS AN OPTION WHICH, IF EXERCISED, RESULTS IN THE ESTABLISHMENT OF A FUTURES CONTRACT (AN "OPTION ON A FUTURES CONTRACT") OR RESULTS IN THE MAKING OR TAKING OF DELIVERY OF THE ACTUAL COMMODITY UNDERLYING THE OPTION (AN "OPTION ON A PHYSICAL COMMODITY"). BOTH THE PURCHASER AND THE GRANTOR OF AN OPTION ON A PHYSICAL COMMODITY SHOULD BE AWARE THAT, IN CERTAIN CASES, THE DELIVERY OF THE ACTUAL COMMODITY UNDERLYING THE OPTION MAY NOT BE REQUIRED AND THAT, IF THE OPTION IS EXERCISED, THE OBLIGATIONS OF THE PURCHASER AND GRANTOR WILL BE SETTLE IN CASH. A PERSON SHOULD NOT PURCHASE ANY COMMODITY OPTION UNLESS HE IS ABLE TO SUSTAIN A TOTAL LOSS OF THE PREMIUM AND TRANSACTION COSTS OF PURCHASING THAT OPTION. A PERSON SHOULD NOT GRANT ANY COMMODITY OPTION UNLESS HE IS ABLE TO MEET ADDITIONAL CALLS FOR MARGIN WHEN THE MARKET MOVES AGAINST HIS POSITION AND, IN SUCH CIRCUMSTANCES, TO SUSTAIN A VERY LARGE FINANCIAL LOSS. A PERSON WHO PURCHASES AN OPTION SHOULD BE AWARE THAT IN ORDER TO REALIZE ANY VALUE FROM THE OPTION, IT WILL BE NECESSARY EITHER TO OFFSET THE OPTION POSITION OR TO EXERCISE THE OPTION. IF AN OPTION PURCHASER DOES NOT UNDERSTAND HOW TO OFFSET OR EXERCISE AN OPTION, THE PURCHASER SHOULD REQUEST AN EXPLANATION FROM THE FUTURES COMMISSION MERCHANT OR THE INTRODUCING BROKER. CUSTOMERS SHOULD BE AWARE THAT IN A NUMBER OF CIRCUMSTANCES, SOME OF WHICH WILL BE DESCRIBED IN THIS DISCLOSURE STATEMENT, IT MAY BE DIFFICULT OR IMPOSSIBLE TO OFFSET AN EXISTING OPTION POSITION ON AN EXCHANGE. THE GRANTOR OF AN OPTION SHOULD BE AWARE THAT, IN MOST CASES, A COMMODITY OPTION MAY BE EXERCISED AT ANY TIME FROM THE TIME IT IS GRANTED UNTIL IT EXPIRES. THE PURCHASER OF AN OPTION SHOULD BE AWARE THAT SOME OPTION CONTRACTS MAY PROVIDE ONLY A LIMITED PERIOD OF TIME FOR EXERCISE OF THE OPTION.

THE PURCHASER OF A PUT OR A CALL IS SUBJECT TO THE RISK OF LOSING THE ENTIRE PURCHASE PRICE OF THE OPTION - THAT IS THE PREMIUM PAID FOR THE OPTION PLUS ALL TRANSACTION COSTS.

THE COMMODITY FUTURES TRADING COMMISSION REQUIRES THAT ALL CUSTOMERS RECEIVE AND ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE STATEMENT BUT DOES NOT INTEND THIS STATEMENT AS A RECOMMENDATION OR ENDORSEMENT OF EXCHANGE-TRADED COMMODITY OPTIONS.

### (1) Some of the risks of Option Trading.
Special market movement of the underlying future or underlying physical commodity cannot be predicted accurately.

The grantor of a call option who does not have a long position in the underlying futures contract or underlying physical commodity is subject to risk of loss should the price of the underlying futures contract or underlying physical commodity increase by an amount greater than the premium received for granting the call option.

The grantor of a call option who has a long position in the underlying futures contract or underlying physical commodity is subject to the full risk of a decline in price of the underlying position. In exchange for the premium received for granting a call option, the option grantor gives up all of the potential gain resulting from an increase in the price of the underlying futures contract or underlying physical commodity above the option strike price if the option is exercised against the grantor.

The grantor of a put option who does not have a short position in the underlying futures contract or underlying physical commodity (i.e., commitment to sell the physical) is subject to risk of loss should the price of the underlying futures contract or underlying physical commodity decrease by an amount in excess of the premium received for granting the put option.

The grantor of a put option on a futures contract who has a short position in the underlying futures contract is subject to the full risk of a rise in the price in the underlying position. In exchange for the premium received for granting a put option on a futures contract, the option grantor gives up all of the potential gain resulting from a decrease in the price of the underlying futures contract below the option strike price if the option is exercised against the grantor. The grantor of a put option on a physical commodity who has a short position (e.g., commitment to sell the physical) is subject to the full risk of a rise in the price of the physical commodity which must be obtained to fulfill the commitment reduced by the premium received for granting the put. In exchange for the premium, the grantor of a put option on a physical commodity gives up all the potential gain which would have resulted from a decrease in the price of the commodity below the option strike price upon exercise or expiration of the option.

### (2) Description of Commodity Options.
Prior to entering into any transaction involving a commodity option, an individual should thoroughly understand the nature and type of option and the underlying futures contract or underlying physical commodity involved. The futures commission merchant or the introducing broker is required to provide, and the individual contemplating an option transaction should obtain, a description of the following:

(i) the futures contract or the physical commodity which is the subject of the option;

(ii) the quantity of the underlying futures contract or underlying physical commodity which may be purchased or sold upon exercise of the option or, if applicable, whether exercise of the option will be settled in cash;

(III) the procedure for exercise of the option contract, including the expiration date and latest time on that date for exercise (the latest time on an expiration date when an option may be exercised may vary; therefore, option market participants should ascertain from their futures commission merchant or their introducing broker the latest time the firm accepts exercise instructions with respect to a particular option);

(iv) a description of the purchase price of the option including the premium, commissions, costs, fees and other charges (since commissions and other charges may vary widely among futures commission merchants and among introducing brokers, option customers may find it advisable to consult more than one firm when opening an option account);

(v) a description of all costs in addition to the purchase price which may be incurred if the commodity option is exercised, including the amount of commissions (whether termed sales commissions or otherwise), storage, interest, and all similar fees and charges which may be incurred;

(vi) an explanation and understanding of an option grantor's initial margin requirement and obligation to provide additional margin in connection with such an option position, or a position in a futures contract, if applicable;

(vii) a clear explanation and understanding of any clauses in the option contract and to any terms included in the option contract explicitly or by reference which might affect the customer's obligation under the contract including any policy of the futures commission merchant or the introducing broker or rule of the exchange on which the option is traded that might affect the customer's ability to fulfill the option contract or to offset the option position in a closing purchase or closing sale transaction (for example, due to unforeseen circumstances that require suspension or termination of trading); and

(vii) if applicable, a description of the effect upon the value of the option position that could result from limit moves in the underlying futures contract.

20

**(3) The Mechanics of Option Trading.**
Before entering into any exchange-traded option transaction, an individual should obtain a description of how commodity options are traded.

Option customers should clearly understand that there is no guarantee that option positions may be offset by either a closing purchase or closing sale transaction on an exchange. In this circumstance, option grantors could be subject to the full risk of their positions until the option positions expire, and the purchaser of a profitable option might have to exercise the option to realize a profit.

For an option on a futures contract, an individual should clearly understand the relationship between exchange rules governing option transactions and exchange rules governing the underlying futures contract. For example, an individual should understand that action, if any, the exchange will take in the option market if trading in the underlying futures market is restricted or the futures prices have made a "limit move."

The individual should understand that the option may not be subject to the daily price fluctuation limits while the underlying future may have such limits, and, as a result, normal pricing relationships between options and the underlying future may not exist when the future is trading at its price limit. Also, underlying futures positions resulting from exercise of options may not be capable of being offset if the underlying future is at a price limit.
**(4) Margin Requirements.**

Commodity Futures Trading Commission rules require the purchaser of an option to pay the full option premium when the option position is opened. Before granting an action, an individual should fully understand the applicable margin requirements, and particularly should be aware of the obligation to put up additional margin money in the case of adverse market moves.

**(5) Profit Potential of an Option Position.**
An option customer should carefully calculate the price which the underlying futures contract or underlying physical commodity would have to reach for the option position to become profitable. This price would include the amount by which the underlying futures contract or underlying physical commodity would have to rise above or fall below the strike price to cover the sum of the premium and all other costs incurred in entering into the exercising or closing (offsetting) the commodity option position.

Also, an option customer should be aware of the risk that the futures price prevailing at the opening of the next trading day may be substantially different from the futures price which prevailed when the option was exercised. Similarly, for options on physicals that are cash settled, the physicals price prevailing at the time the option is exercised may differ substantially from the cash settlement price that is determined at a later time. Thus, if a customer does not cover the position against the possibility of underlying commodity price change the realized price upon option exercise may differ substantially from that which existed at the time of exercise.

**(6) Deep-Out-Of-The-Money Options.**
A person contemplating purchasing a deep-out-of-the-money option (that is, an option with a strike price significantly above, in the case of a call, or significantly below, in the case of a put, the current price of the underlying futures contract or underlying physical commodity) should be aware that the chance of such an option becoming profitable is ordinarily remote.

On the other hand, a potential grantor of a deep-out-of-the-money option should be aware that such options normally provide small premiums while exposing the grantor to all of the potential losses described in section (1) of this disclosure statement.

**(7) Fees.**
Alaron Trading Corporation charges a fee for options to each customer, Introducing Broker, or Commodity Trading Advisor. Customers of Introducing Brokers or Commodity Trading Advisors may or may not be charged a fee which differs from this basic Alaron Trading Corporation fee. You should check with your broker to determine the exact amount of the fee which you are to be charged.

**(8) Glossary of Terms.**
(i) Underline Contract market - Any board of trade (exchange) located in the United States which has been designated by the Commodity Futures Trading Commission to a list of futures contract or commodity option for trading.

(ii) Exchange-traded option; put option; call option - The options discussed in this disclosure statement are limited to those which may be traded on a contract market. These options (subject to certain exceptions) give an option purchaser the right to buy in the case of a call option, or to sell in the case of a put option, a futures contract or the physical commodity underlying the option at the stated strike price prior to the expiration date of the option. Each exchange-traded option is distinguished by the underlying futures contract or underlying physical commodity, strike price, expiration date, and whether the option is a put or a call.

(iii) Underlying futures contract - The futures contract which may be purchased or sold upon the exercise of an option on a futures contract.

(iv) Underlying physical commodity - The commodity of a specific grade (quality) and quantity which may be purchased or sold upon the exercise of an option on a physical commodity.

(v) Class of options - A put or a call covering the same underlying futures contract or underlying physical commodity.

(vi) Series of options - Options of the same class having the same strike price and expiration date.

(vii) Exercise price - See strike price.

(viii) Expiration date - The last day when an option may be exercised.

(ix) Premium - The amount agreed upon between the purchaser or seller for the purchase or sale of a commodity option.

(x) Strike price - The price at which a person may purchase or sell the underlying futures contract or underlying physical commodity upon exercise of a commodity option. This term has the same meaning as the term "exercise price."

(xi) Short option position - See opening sale transaction.

(xii) Long Option position - See opening purchase transaction.

(xiii) **Types of options transactions -**

(A) Opening purchase transaction - A transaction in which an individual purchases an option and thereby obtains a long option position.

(B) Opening sale transaction - A transaction in which an individual grants an option and thereby obtains a short option position.

(C) Closing purchase transaction - A transaction in which an individual with a short option position liquidates the position. This is accomplished by a closing purchase transaction for an option of the same series as the option previously granted. Such a transaction may be referred to as an offset transaction.

(D) Closing sale transaction - A transaction in which an individual with a long option position liquidates the position. This is accomplished by a closing sale transaction for an option of the same series as the option previously purchased. Such a transaction may be referred to as an offset transaction.

(xiv) Purchase price - The total actual cost paid or to be paid, directly or indirectly, by a person to acquire a commodity option. This price includes all commissions and other fees, in addition to the option.

(xv) Grantor, writer, seller - An individual who sells an option. Such a person is said to have a short position.

(xvi) Purchaser - An individual who buys an option. Such a person is said to have a long position.

PLEASE SIGN OPTIONS DISCLOSURE STATEMENT ON CUSTOMER SIGNATURE FORM, PAGE 13.

21

Alaron Trading Corporation
## ACCOUNT TRANSFER FORM

DATE SENT:_____ _____

TO: TRANSFERRING FIRM
    (NAME AND ADDRESS OF FIRM YOU ARE TRANSFERRING FROM)

FIRM NAME: FIRM ADDRESS: _____

FIRM PHONE NUMBER: _____

ACCOUNT NO.(S): _____

ACCOUNT TITLE: _____

ACCOUNT ADDRESS: _____

NAME OF INTRODUCING BROKER: _____

**RECEIVING FIRM:**
ALARON TRADING CORPORATION
822 W. WASHINGTON
CHICAGO, IL 60607
(312) 563-8000

IN ACCORDANCE WITH THE NATIONAL FUTURES ASSOCIATION (NFA) COMPLIANCE RULE 2-27 PLEASE TRANSFER IMMEDIATELY ALL OF THE CASH BALANCES, OPEN POSITIONS, AND TREASURY BILLS OR ANY COLLATERAL IN MY (OUR) ACCOUNT TO ALARON TRADING CORPORATION.

VERY TRULY YOURS,

_____
Customer(s) Name(s) Printed

_____


_____


_____       _____
Customer(s) Signature(s)          Date

_____       _____
                               Date

**NOTE:** If joint account or general partnership, all persons must sign. If this is a limited partnership account, the general or managing partner must sign.

### *PLEASE ATTACH YOUR LAST STATEMENT.*

ALARON TRADING CORPORATION

I acknowledge that the Alaron Customer Application, Agreement and accompanying Risk Disclosures have not been altered by me in any way. In the event that such documents have been altered, I understand that I am bound by an original unaltered Alaron Customer Application, Agreement and its accompanying Risk Disclosure whether or not executed by me. If it is discovered that I have altered these documents, I understand that Alaron may take any action with regard to my account, as it may deem necessary, with all cost/losses to be assumed by me.

**IF JOINT:**

_____          _____
Customer Signature                                  Customer Signature

Print name_____          Print name_____

_____          _____
Dated                                                     Dated

## ADDITIONAL RISK DISCLOSURE

In light of the financial and/or personal information provided by you on your account application, it might be interpreted that:

1. The amount of funds you have committed to your Futures/Options Account with this firm might be overly substantial in relation to your annual income and/or net worth.

2. Based on your personal information and investment experience (or apparent lack thereof), futures/options trading might be too risky of an investment strategy.

Based on these criteria, Alaron Trading Corporation is providing you with the following Additional Risk Disclosure information.

Futures and Options trading is generally considered to be a risky form of investment. If you have pursued conservative forms of investment in the past, you may wish to study futures and options trading further before considering an investment. You must realize that you could sustain a total loss of all funds deposited with Alaron as initial margin as well as substantial amounts of additional capital required to margin your positions. If you cannot deposit additional funds, your position(s) could be liquidated at a loss for which you will be responsible.

We ask that you acknowledge by your signature below, that the funds you have committed are purely risk capital, and that such investment will not jeopardize your style of living, nor will it detract from your future retirement program. You further acknowledge that you fully understand the nature of such investment, the risks involved and that your obligations to others will not be neglected by possible loss of funds invested.

I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND UNDERSTOOD THE ABOVE ADDITIONAL RISK DISCLOSURE STATEMENT.

**IF JOINT:**

_____          _____
Signature                                            Signature

Print name_____          Print name_____

_____          _____
Dated                                                     Dated

ALARON TRADING CORPORATION

# ALARONLINE

We appreciate your interest in ALARONLINE. Please read this Agreement before using any of Alaron's online services. Your use of ALARON-LINE, or signed acknowledgment, will indicate your acceptance of all of the following terms. If this Agreement is unacceptable to you, do not use ALARONLINE. Alaron is willing to provide ALARONLINE to you only if you agree to be bound by the following terms.

1) Customer acknowledges all information received and orders placed through Alaron via electronic or online means (hereinafter "System") are at Customer's sole risk. Customer understands that orders which are sent directly to the floor may not stop at Customer's broker or order desk to be reviewed. As a result, errors made in the transmission of the order are the responsibility of Customer. Further, if orders are sent directly to the trading floor (or to an electronic trading system) Customer acknowledges that there are limits set by commodity on the maximum number of contracts on an order going directly to the floor.

2) Customer further acknowledges that some of the information available on ALARONLINE is produced by various independent sources believed to be reliable ("Data Providers"). Customer also acknowledges that the accuracy, completeness, timeliness and correct sequencing of the real-time information concerning customer's trading and account activity, quotes, market news, charts, trading analysis and strategies (the "Data") are not guaranteed by Alaron or the Data Providers. Customer agrees that neither Alaron nor the Data Providers shall have any liability for the accuracy, completeness, timeliness, or correct sequencing of the information or for any decision made or taken by Customer in reliance upon the Data or the System or for any interruption of any data, information, or aspect of the System. The System is made available via the Internet.

3) The Data provided by the Data Providers is the property of the Data Providers or others and may be protected by copyright. Customer agrees not to reproduce, retransmit, disseminate, sell or distribute the Data in any manner without the express written consent of Alaron and the relevant Data Provider(s); nor to use the information for any unlawful purpose.

4) Alaron reserves the right to require a margin deposit prior to the execution of any order placed electronically or via online means. If any order which Customer enters places his/her account in an undermargined condition, Alaron's margin policy applies. Alaron will not be responsible for any delay or failure to provide online or electronic service, including the execution of any order. In the event that there is a restriction on customer's account or customer delays or fails to make such a margin deposit.

5) Customer further acknowledges that Alaron may terminate Customer's access to the System, or any portion thereof; or place restrictions upon Customer's trading account, for reasons Alaron, in its sole discretion, may deem necessary, including by not limited to, Customer's account being undermargined or in a deficit position; Alaron finding that the data contained in Customer's account application is false or no longer valid; Customer's breach of this Agreement; or, the unauthorized use of customer's account number or other password(s). Customer understands that if there is a restriction on his/her trading account, (s)he will not be able to use the system's online/electronic trading function.

6) Customer agrees to notify Alaron of any loss or theft of Customer's account number or password for entry into the System. Customer further agrees to immediately notify Alaron of any inaccurate account information in any report Customer receives while accessing online/electronic services.

7) In no event will Alaron be liable to you or anyone else for any consequential, incidental, special or indirect damages, including but not limited to lost profits, trading losses, or damages that result from inconvenience, delay, loss of the use of the system, or any error contained therein. Alaron shall not be liable for any loss resulting from system failure, breakdown of electronic or mechanical equipment or communication lines; telephone or other interconnect problems; unauthorized access; theft; operator errors; severe weather; earthquakes; strikes or other labor problems; and any other losses which result from causes over which Alaron does not exercise control. You will be responsible for all orders entered through and under your password(s), and account number(s), and any orders so received by Alaron will be deemed to have been placed by you at the time received by Alaron and in the form received.

8) Customer agrees to pay all subscription, service and use fees, if any, and commissions for any orders executed through the System and agrees that such fees may be changed without notice.

9) By signing this Agreement you represent that you have read and understood the foregoing terms and conditions and agree to be bound by them. This Agreement supplements Alaron's Customer Agreement. If any provision of the Agreement is invalid or unenforceable under applicable law, it is, to the extent, deemed omitted and the remaining provisions will continue in full force and effect.

**IF JOINT:**

_____          _____
Customer Signature                          Customer Signature

Print name_____          Print name_____


_____          _____
Date                                        Date

Dated Account #_____

E-mail Address_____

**Alaron Trading Corporation**
## Alaron Trading Agreement

I acknowledge that the Alaron Customer Application, Agreement and accompanying Risk Disclosures have not been altered by me in any way. In the event that such documents have been altered, I understand that I am bound by an original unaltered Alaron Customer Application, Agreement and its accompanying Risk Disclosures whether or not executed by me. If it is discovered that I have altered these documents, I understand that Alaron may take any action with regard to my account, as it may deem necessary, with all costs/losses to be assumed by me.

**IF JOINT:**

_____     _____
Customer Signature                   Customer Signature

Print name_____     Print name_____


_____     _____
Date                                 Date

25



**Alaron**
FUTURES AND OPTIONS

822 West Washington Boulevard
Chicago, Illinois  60607
312-563-8000
www.alaron.com

COMBINED COMMODITY STATEMENTS

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO   80526

| DATE |
| --- |
| AUG  2, 2005 |
| **ACCOUNT NUMBER** |
| 500IB133 50036990 |

INTRODUCED BY:  JAMES RICHARD GAUSPOHL
SEGREGATED ACCT                    US DOLLARS                              PAGE   1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | AMOUNT DEBIT | CREDIT |
| --- | --- | --- | --- | --- | --- | --- |
| 7/07/05 | | | ACCOUNT BALANCE -US DOLLARS FUNDS SEG ACCT | | | 381.30 |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | | | | | | |
| | | | ORDER DESK TICKET FEE | | 2.00 | |
| | | | ORDER DESK TICKET FEE | | 2.00 | |
| | | CURRENT ACCOUNT BALANCE -US DOLLARS FUNDS | | | | 377.30 * |

- - - - - - - - - - - - O P E N   P O S I T I O N S - - - - - - - - - - - -

| 7/06/05 | 10 | | SEP05 CBT T-BOND  112.000 P | 13/64 | | 2,500.00 |
| | 10* | * | OPTIONS MARKET VALUE | | | 2,500.00 * |
| | | | EXP  8/26/05  LST TRD  8/19/05 | 16/64 | | |
| | | | SETTLEMENT PRICE | | | |

```
                    TOTAL OPEN TRADE EQUITY                .00
                              TOTAL EQUITY              377.30
            TOTAL LONG OPTION MARKET VALUE            2,500.00
           TOTAL SHORT OPTION MARKET VALUE                .00
                             NET LIQUIDITY            2,877.30
```

- - - - - - - - - - - M A R G I N   S U M M A R Y - - - - - - - - - - - - -

```
                    INITIAL MARGIN             .00
                    MAINTENANCE MARGIN         .00
                    EXCESS CASH             377.30
```

"It is agreed that all commodity futures transactions made by us for your account are made in accordance with the terms of our standard form of commodity trading agreement, said terms being incorporated herein by reference, and to the rules, regulations and customs of the exchanges whereon made."

"The contracts entered into for your account contemplate your delivery of the commodity or receipt thereof with payment therefor."

"It is further agreed, notwithstanding any past dealings or course of conduct between us, that we reserve the right to demand wire transfer of funds for margins and, without notice, to close out any or all contracts entered into by us for your account when the margins on deposit with us (i) are exhausted, or (ii) are inadequate in our judgment to protect us against price fluctuations or (iii) are below the minimum margin requirements established by the rules and regulations of the exchanges whereon the trades are made."

"Orders are accepted in accordance with (i) terms of our standard form of commodity trading agreement, (ii) Federal and State laws, rules and regulations, and (iii) the rules, regulations and customs of exchanges on which they are to be executed, and are good until cancelled."

"The name of the other party or broker and time of execution may be furnished upon request."

"Please note the entering of another order to buy or sell the same contract at another price does not automatically cancel a previous open order.  Any error must be reported to us immediately by telephone."

**U.S. Treasury Bond Puts (Pit/ETS) 05Sep 11200 from July 22, 2005 to August 2, 2005**

PG/OZBP 05Sep 11200    July 2005

| Date | Contract | Open 1 | Open 2 | High | Low | Close 1 | Close 2 | Settle |
|------|----------|--------|--------|------|-----|---------|---------|--------|
| | PG 05Sep 11200 | 15<br>7:25:09 | | 15<br>7:25:09 | 11<br>9:28:24 | 11<br>14:10:43 | | 11<br>14:10:43 |
| 22-Jul | OZBP 05Sep 11200 | 15<br>2:19:47 | | 15<br>2:19:47 | 15<br>2:19:47 | | | 11<br>16:13:23 |
| | PG 05Sep 11200 | 10<br>7:35:15 | | 13<br>13:38:04 | 9<br>9:25:51 | 13<br>14:10:34 | | 13<br>14:10:34 |
| 25-Jul | OZBP 05Sep 11200 | 11<br>19:02:07 | | 11<br>19:02:07 | 9<br>9:56:37 | 10<br>11:16:16 | | 13<br>16:05:36 |
| | PG 05Sep 11200 | 10<br>7:21:03 | | 12<br>7:45:44 | 10<br>7:21:03 | 11<br>14:09:27 | | 11<br>14:09:27 |
| 26-Jul | OZBP 05Sep 11200 | | | | | 11 N<br>16:11:34 | | 11<br>16:11:34 |
| | PG 05Sep 11200 | 9<br>7:52:02 | | 12<br>12:05:08 | 9<br>7:52:02 | 12<br>14:08:44 | | 12<br>14:08:44 |
| 27-Jul | OZBP 05Sep 11200 | 12<br>11:38:07 | | 12<br>11:38:07 | 12<br>11:38:07 | | | 12<br>16:08:49 |
| | PG 05Sep 11200 | 9<br>9:09:40 | | 9<br>9:09:40 | 5<br>13:41:44 | 6<br>14:11:28 | | 6<br>14:11:28 |
| 28-Jul | OZBP 05Sep 11200 | | | | | 6 N<br>16:15:09 | | 6<br>16:15:09 |
| | PG 05Sep 11200 | 10<br>9:07:36 | | 12<br>9:37:55 | 9<br>9:09:26 | 12<br>14:07:23 | | 12<br>14:07:23 |
| 29-Jul | OZBP 05Sep 11200 | 5<br>19:35:41 | | 12<br>13:10:16 | 5<br>19:35:41 | 11<br>13:53:39 | | 12<br>16:10:32 |

PG/OZBP 05Sep 11200    August 2005

| Date | Contract | Open 1 | Open 2 | High | Low | Close 1 | Close 2 | Settle |
|------|----------|--------|--------|------|-----|---------|---------|--------|
| | PG 05Sep 11200 | 13<br>7:34:26 | | 19<br>9:40:11 | 12<br>7:54:23 | 15<br>14:09:25 | | 15<br>14:09:25 |
| 1-Aug | OZBP 05Sep 11200 | 10<br>23:58:59 | | 19<br>10:52:05 | 10<br>23:58:59 | 13<br>14:15:34 | | 15<br>16:12:28 |
| | PG 05Sep 11200 | 15<br>7:29:34 | | 18<br>10:56:03 | 14<br>8:52:45 | 16<br>14:10:13 | | 16<br>14:10:13 |
| 2-Aug | OZBP 05Sep 11200 | 12<br>22:19:29 | | 17<br>11:50:01 | 12<br>22:19:29 | 15<br>13:39:19 | | 16<br>16:12:47 |

**U.S. Treasury Bond Puts (Pit/ETS) 05Sep 11200 from August 3, 2005 to August 10, **

PG/OZBP 05Sep 11200    August 2005

| Date | Contract | Open 1 | Open 2 | High | Low | Close 1 | Close 2 | Settle |
|------|----------|--------|--------|------|-----|---------|---------|--------|
| | PG 05Sep 11200 | 13 8:33:39 | | 13 8:33:34 | 9 10:51:19 | 10 14:11:18 | | 10 14:11:18 |
| 3-Aug | OZBP 05Sep 11200 | 15 0:01:12 | | 16 7:27:05 | 10 12:05:30 | 10 15:11:30 | | 10 16:05:16 |
| | PG 05Sep 11200 | 9 7:20:18 | | 11 13:01:37 | 9 7:20:18 | 10 14:11:05 | | 10 14:11:05 |
| 4-Aug | OZBP 05Sep 11200 | 8 21:11:17 | | 10 12:03:15 | 7 0:25:36 | 10 12:03:15 | | 10 16:09:28 |
| | PG 05Sep 11200 | 9 7:24:24 | | 13 9:04:35 | 9 7:24:24 | 13 14:10:39 | | 13 14:10:39 |
| 5-Aug | OZBP 05Sep 11200 | 8 22:18:04 | | 13 13:00:33 | 8 22:18:04 | 13 13:17:11 | | 13 16:07:27 |
| | PG 05Sep 11200 | 12 7:20:53 | | 14 8:59:02 | 11 9:46:26 | 13 14:13:44 | | 13 14:13:44 |
| 8-Aug | OZBP 05Sep 11200 | 13 23:48:26 | | 13 23:48:26 | 12 2:43:00 | 12 2:43:00 | | 13 16:11:43 |
| | PG 05Sep 11200 | 12 7:20:15 | | 15 10:55:23 | 9 13:59:41 | 10 14:08:24 | | 10 14:08:24 |
| 9-Aug | OZBP 05Sep 11200 | 14 12:13:49 | | 14 12:13:49 | 9 15:52:58 | 9 15:52:58 | | 10 16:18:49 |
| | PG 05Sep 11200 | 8 7:23:17 | | 9 12:12:59 | 5 7:35:13 | 9 14:07:17 | | 9 14:07:17 |
| 10-Aug | OZBP 05Sep 11200 | 8 20:04:46 | | 9 12:53:50 | 7 12:06:23 | 9 12:53:50 | | 9 16:07:08 |



**Alaron**
FUTURES AND OPTIONS

822 West Washington Boulevard
Chicago, Illinois 60607
312-563-8000
www.alaron.com

COMBINED COMMODITY STATEMENTS

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO   80526

| DATE |
| --- |
| JUL  7, 2005 |
| **ACCOUNT NUMBER** |
| 500IB133 50036990 |

INTRODUCED BY:   JAMES RICHARD GAUSPOHL
SEGREGATED ACCT                    US DOLLARS                          PAGE    1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | AMOUNT DEBIT | CREDIT |
| --- | --- | --- | --- | --- | --- | --- |
| 7/06/05 | | | ACCOUNT BALANCE -US DOLLARS FUNDS SEG ACCT | | | 383.30 |
| | | | ORDER DESK TICKET FEE | | 2.00 | |
| | | | CURRENT ACCOUNT BALANCE -US DOLLARS FUNDS | | | 381.30 * |

- - - - - - - - - - - - - - - - O P E N   P O S I T I O N S - - - - - - - - - - - - - - - -

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| 7/06/05 | 10 | | SEP05 CBT T-BOND  112.000 P | 13/64 | | 1,718.80 |
| | 10* | | *        OPTIONS MARKET VALUE | | | 1,718.80 * |
| | | | EXP  8/26/05  LST TRD  8/19/05 | | | |
| | | | SETTLEMENT PRICE | 11/64 | | |
| | | | TOTAL OPEN TRADE EQUITY | | | .00 |
| | | | TOTAL EQUITY | | | 381.30 |
| | | | TOTAL LONG OPTION MARKET VALUE | | | 1,718.80 |
| | | | TOTAL SHORT OPTION MARKET VALUE | | | .00 |
| | | | NET LIQUIDITY | | | 2,100.10 |

- - - - - - - - - - - - - M A R G I N   S U M M A R Y - - - - - - - - - - - - -

| | |
| --- | --- |
| INITIAL MARGIN | .00 |
| MAINTENANCE MARGIN | .00 |
| EXCESS CASH | 381.30 |

Retain for Tax Records.                                                                          Terms and Conditions on Back Side.



**822 West Washington Boulevard**
**Chicago, Illinois 60607**
**312-563-8000**
**www.alaron.com**

STATEMENT OF MONTHLY ACTIVITY

| | DATE |
|---|---|
| | JUL 31, 2005 |
| | ACCOUNT NUMBER |
| | 500IB133 50036990 |

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO   80526

INTRODUCED BY:   JAMES RICHARD GAUSPOHL
CUSTOMER                                              PAGE    1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | AMOUNT DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 7/01/05 | | | BALANCE FORWARD   US DOLLARS SEG ACCT | | | .00 |
| 7/05/05 | | | 7/1/05 WIRE IN | | | 3,200.00 |
| 7/06/05 | 10 | | SEP05  CBT T-BOND 112.000 P CONF | | 2,816.70 | |
| 7/07/05 | | | ORDER DESK TICKET FEE | | 2.00 | |

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

7/31/05 ACCOUNT BALANCE -US DOLLARS SEG ACCT . . . . .                381.30*

| | | |
|---|---|---|
| NET FUTURES PROFIT OR LOSS FOR MONTH | | .00* |
| NET OPTIONS PREMIUM PAID/RCVD FOR MONTH | 2,816.70 | * |
| NET REALIZED PROFIT OR LOSS FOR MONTH | 2,816.70 | * |
| NET MATURED COLLATERAL FOR MONTH | | .00* |

```
- - - - - - - - - - - O P E N   P O S I T I O N S - - - - - - - - - - - -
```

| | | | | | |
|---|---|---|---|---|---|
| 7/06/05 | 10 | | SEP05  CBT T-BOND 112.000 P    13/64 | | 1,875.00 |
| | | | OPT EXP  8/26/05  LAST TRD  8/19/05 | | |
| | 10* | | OPTIONS MARKET VALUE | | 1,875.00* |
| | | | SETTLEMENT PRICE    12/64 | | |
| | | | TOTAL OPEN TRADE EQUITY | | .00 |
| | | | TOTAL EQUITY | | 381.30 |
| | | | TOTAL LONG OPTION MARKET VALUE | | 1,875.00 |
| | | | TOTAL SHORT OPTION MARKET VALUE | | .00 |
| | | | NET LIQUIDITY | | 2,256.30 |



**822 West Washington Boulevard
Chicago, Illinois 60607
312-563-8000
www.alaron.com**

**Alaron**
FUTURES AND OPTIONS

COMBINED COMMODITY STATEMENTS

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO   80526

| DATE |
|---|
| AUG 12, 2005 |
| ACCOUNT NUMBER |
| 500IB133 50036990 |

INTRODUCED BY:   JAMES RICHARD GAUSPOHL
SEGREGATED ACCT                    US DOLLARS                    PAGE   1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 8/11/05 | | | ACCOUNT BALANCE -US DOLLARS FUNDS SEG ACCT | | | 363.30 |
| | | | ORDER DESK TICKET FEE | | 2.00 | |
| | | | CURRENT ACCOUNT BALANCE -US DOLLARS FUNDS | | | 361.30 * |

- - - - - - - - - - - O P E N   P O S I T I O N S - - - - - - - - - - -

| 7/06/05 | 10 | | SEP05 CBT T-BOND  112.000 P | 13/64 | | 156.30 |
| | 10* | * | OPTIONS MARKET VALUE | | | 156.30 * |
| | | | EXP 8/26/05  LST TRD 8/19/05 | | | |
| | | | SETTLEMENT PRICE | 1/64 | | |

```
                     TOTAL OPEN TRADE EQUITY              .00
                          TOTAL EQUITY               361.30
            TOTAL LONG OPTION MARKET VALUE            156.30
           TOTAL SHORT OPTION MARKET VALUE               .00
                          NET LIQUIDITY              517.60
```

- - - - - - - - - - - M A R G I N   S U M M A R Y - - - - - - - - - - -

```
                     INITIAL MARGIN                  .00
                     MAINTENANCE MARGIN              .00
                     EXCESS CASH                  361.30
```

Retain for Tax Records.                                                      Terms and Conditions on Back Side.



**Alaron**
FUTURES AND OPTIONS

822 West Washington Boulevard
Chicago, Illinois 60607
312-563-8000
www.alaron.com

COMBINED COMMODITY STATEMENTS

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO   80526

| DATE |
| --- |
| AUG 16, 2005 |
| ACCOUNT NUMBER |
| 500IB133 50036990 |

INTRODUCED BY:   JAMES RICHARD GAUSPOHL
SEGREGATED ACCT              US DOLLARS                          PAGE    1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | AMOUNT DEBIT | AMOUNT CREDIT |
| --- | --- | --- | --- | --- | --- | --- |
| 8/15/05 | | | ACCOUNT BALANCE -US DOLLARS FUNDS SEG ACCT | | | 359.30 |

- - - - - - - - - - - - C O N F I R M A T I O N S - - - - - - - - - - - - - - -

WE HAVE MADE THIS DAY THE FOLLOWING TRADES FOR YOUR ACCOUNT AND RISK.

|  | 10 | | SEP05 CBT T-BOND  112.000 PV  .20 | | | 2.00 |
| | * | 10* | PREMIUM COLLECTED | | | 2.00 * |
| | | | EXP 8/26/05  LST TRD 8/19/05 | | | |

TOTAL OPTION PREMIUM ON CONFIRMATIONS                          2.00 *

- - - - - - - - - - - - - P U R C H A S E   &   S A L E - - - - - - - - - - - -

| 7/06/05 | 10 | | SEP05 CBT T-BOND  112.000 P | 13/64 | | |
| 8/16/05 | | 10 | SEP05 CBT T-BOND  112.000 PV | .20 | | |
| | 10* | 10* | OPTIONS P&L *FOR INFORMATION ONLY | | 2,029.30 | * |

GROSS PROFIT OR LOSS FROM OFFSET TRADES                          .00

NET PROFIT OR LOSS FROM OFFSET TRADES                          .00 *

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ORDER DESK TICKET FEE                                2.00

CURRENT ACCOUNT BALANCE -US DOLLARS FUNDS                          359.30 *

- - - - - - - - - - - - - M A R G I N   S U M M A R Y - - - - - - - - - - - - -

INITIAL MARGIN                          .00
MAINTENANCE MARGIN                          .00
EXCESS CASH                          359.30



**822 West Washington Boulevard**
**Chicago, Illinois  60607**
**312-563-8000**
**www.alaron.com**

COMBINED COMMODITY STATEMENTS

AARON J. DOUGLAS
3267 GUNNISON DRIVE.
FORT COLLINS, CO    80526

| DATE |
| :---: |
| AUG 18, 2005 |
| ACCOUNT NUMBER |
| 500IB133 50036990 |

INTRODUCED BY:   JAMES RICHARD GAUSPOHL
SEGREGATED ACCT                    US DOLLARS                                   PAGE   1

| DATE | BOUGHT LONG | SOLD SHORT | COMMODITY/OPTION DESCRIPTION | PRICE | AMOUNT DEBIT | AMOUNT CREDIT |
| --- | --- | --- | --- | --- | --- | --- |
| 8/17/05 | | | ACCOUNT BALANCE -US DOLLARS FUNDS SEG ACCT | | | 373.30 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

```
           CHK OUT 8/18/5                              373.30
CURRENT ACCOUNT BALANCE -US DOLLARS FUNDS                          .00 *
```

- - - - - - - - - - - - M A R G I N   S U M M A R Y - - - - - - - - - - - - - -

```
                  INITIAL MARGIN                       .00
                  MAINTENANCE MARGIN                    .00
                  EXCESS CASH                           .00
```